ROBERT F. BOWMAN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bowman v. Commissioner
Docket No. 3493-84.
United States Tax Court
T.C. Memo 1987-545; 1987 Tax Ct. Memo LEXIS 537; 54 T.C.M. (CCH) 975; T.C.M. (RIA) 87545; October 27, 1987. John E. Crooks, for the petitioner (at *538 trial only). John O. Kent, for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined deficiencies of $ 27,476 and $ 22,006 in petitioner's Federal income taxes for 1979 and 1980 and additions to tax under section 6653(a)[1] of $ 1,374 and $ 1,100, respectively. In an amendment to the answer, respondent claims additional interest under section 6621(c) on the ground that petitioner entered into a sham transaction identical to the sham transaction described in Moore v. Commissioner,85 T.C. 72 (1985). The question for decision is whether petitioner may deduct $ 60,000 in each year as an "exclusive distributorship" fee. FINDINGS OF FACT Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. Petitioner was a resident of Mission Hills, California, at the time he filed his petition herein. From 1951 to 1980, petitioner worked for the Los Angeles Fire Department. He also engaged in various *539 sales activities, including sales of Amway products, mutual funds, and mail order products. During 1978, petitioner began selling tax-sheltered investments, including a gem distributorship tax shelter known as "Orion" and sponsored by the Cal Am Corporation, Joseph Laird and John E. Crooks. In about June 1979, petitioner was contacted by Earl Martinson with respect to a gem and jewelry business known as American Gold & Diamond Corporation (American Gold). Thereafter petitioner entered into an oral "arrangement" with American Gold. Under that arrangement, petitioner could purchase from American Gold gemstones known as "minimum product." Such minimum product could be sold by petitioner to persons solicited by petitioner to become territorial distributors of United States Distributor, Inc. (U.S. Distributor), an entity of which Joseph Laird and John E. Crooks were principals. On his tax return for 1979, petitioner reported gross receipts of $ 20,850, which receipts resulted from his sale of "minimum product" to prospective distributors that he solicited for U.S. Distributor. On his tax return for 1980, petitioner reported gross receipts of $ 65,691 from that source. The income *540 from sales of minimum product was reported on Schedule C attached to the 1979 and 1980 Forms 1040, where petitioner listed his business as "distributor" and the product as "jewelry." On those Schedules C, he also deducted various business expenses and, for each year, a $ 60,000 distributorship fee. Petitioner claimed deductibility of the distributorship fee based on certain "Contract Documents" dated December 17, 1979. Those contract documents were the same as materials used by petitioner in soliciting prospective distributors for U.S. Distributor. The contract documents consisted of a 36-page (lettered and numbered) Tax Opinion Letter by Somers & Altenbach and a 13-page Territorial Distributorship Agreement with form exhibits A through G. The Tax Opinion Letter contained various warnings to the prospective distributor of potential attacks by the Internal Revenue Service on the deductibility of amounts relating to the distributorship. The opinion warned, among other things, of certain criteria adopted by the Internal Revenue Service for auditing perceived "abusive tax shelters." The opinion stated: E. In the present case, as in any leveraged tax shelter, one or more of such *541 criteria is likely to be present. If so, as in the case of any other leveraged tax shelter, acquisition of a Territorial Distributorship may be regarded by the Service as an "abusive" tax shelter and, therefore, the likelihood that the purchaser's tax return will be subject to audit may be increased. F. Therefore, multiple write-off programs are suspect, and those who buy them are well advised to determine the risks after independent advice from competent lawyers and accountants. * * * 4. Business Merits of the Transaction
The Territorial Distributor will have a right to sell the Product within a specific area. Whether the right is pursued with sufficient diligence is a matter of money, intention and attention to duty. This is true of any business proposition and those matters are beyond the ken of this writer. However, it is assumed herein that bad business ideas must fail and good business ideas may succeed, and whether the buyer of a Territorial Distributorship herein described makes money or loses money is up to him and the buying public.
The opinion analyzed in detail the purported tax benefits from the transaction on the assumption that each territorial *542 distributor adopted the accrual method of accounting for his distributorship. The Territorial Distributorship Agreement identified United States Distributor, Inc., as "distributor"; American Gold & Diamond Corporation as "importer"; and described various types of "product of importer." The agreement provided: 4. IMPORTER has delegated to DISTRIBUTOR the exclusive right to distribute worldwide one hundred (100%) percent of its PRODUCT as is described in Paragraph 3 hereof for a period of fifty years beginning with July 1, 1979. 5. DISTRIBUTOR will not compete with any TERRITORIAL DISTRIBUTOR and agrees that all of the PRODUCT to which it is entitled pursuant to Paragraph 4 will be made available exclusively to TERRITORIAL DISTRIBUTORS. 6. DISTRIBUTOR hereby transfers to TERRITORIAL DISTRIBUTOR an exclusive TERRITORIAL DISTRIBUTORSHIP permitting TERRITORIAL DISTRIBUTOR to engage in the business activity as set forth herein within the Specified Territory, including the right to distribute the PRODUCT to retail and wholesale outlets within the Specified Territory. 7. TERRITORIAL DISTRIBUTOR is entitled, along with all other TERRITORIAL DISTRIBUTORS within the United States, *543 to purchase the entire supply of the PRODUCT of IMPORTER on a pro rata basis with all other TERRITORIAL DISTRIBUTORS.
After various statements about the importer and its product, the agreement provided: B. DISTRIBUTOR warrants that: In the event TERRITORIAL DISTRIBUTOR adopts the accrual method of accounting for the business covered by this TERRITORIAL DISTRIBUTORSHIP AGREEMENT, DISTRIBUTOR will supply at its expense a defense of the tax treatment of TERRITORIAL DISTRIBUTOR projected in the Tax Opinion Letter. Such support will include representation of the Internal Revenue Service level upon the issuance of a 30-day letter from the Internal Revenue Service (IRS Form 950(DO) or its equivalent), and defense in the United States Tax Court and the United States Court of Appeals.
The agreement then set forth various percentages of the stated Estimated Market Retail Price of each of the categories of product to be provided to the territorial distributors but did not contain any references to quantities of product to be sold at any price. The agreement further provided in pertinent part: 16. TERRITORIAL DISTRIBUTOR agrees to make prepayments to DISTRIBUTOR on all Principal *544 Sum Annual Installment Promissory Notes delivered from TERRITORIAL DISTRIBUTOR to DISTRIBUTOR pursuant to this TERRITORIAL DISTRIBUTORSHIP AGREEMENT. Said prepayments will be in the amount of ten (10%) percent of the total cost of TERRITORIAL DISTRIBUTOR for all PRODUCT purchased from IMPORTER pursuant to Paragraph 14. A TERRITORIAL DISTRIBUTOR will be instructed by DISTRIBUTOR as to the method of payment to be utilized with reference to this prepayment requirement. All prepayments received will be applied to Promissory Notes, whether Recourse or Non-Recourse in chronological order. This prepayment requirement will terminate on December 31, 2004. * * * 20. The term of the TERRITORIAL DISTRIBUTORSHIP will be 35 years commencing on the date of this agreement. 21. The TERRITORIAL DISTRIBUTORSHIP will include the Territory described in Exhibit D. 22. TERRITORIAL DISTRIBUTOR is authorized to appoint agents and dealers within the Territory. 23. In consideration of the Territorial Distributorship transferred herein, TERRITORIAL DISTRIBUTOR shall pay to DISTRIBUTOR a Principal Sum as set forth in Exhibit A, Part I, and purchase PRODUCT from IMPORTER as set forth in Exhibit *545 A, Part II.
Exhibit A to the Territorial Distributorship Agreement provided in part as follows: PART I PRINCIPAL SUM
In consideration of the TERRITORIAL DISTRIBUTORSHIP acquired herein, TERRITORIAL DISTRIBUTOR agrees to pay as a Principal Sum the amount set forth in Exhibit D. Said Principal Sum will be paid to DISTRIBUTOR in Annual Installments as follows: (1) One-Twelfth of the Principal Sum on the execution of this Agreement consisting of the Recourse Note set forth in Exhibit E. (2) On or before December 1, 1980, and continuing for an additional 10 years thereafter on December 1 each of said years, TERRITORIAL DISTRIBUTOR will deliver to DISTRIBUTOR: (A) cash in the amount of one-twelfth of the Principal Sum, or (B) a Non-Recourse Note in the amount of one-twelfth of the Principal Sum in the form set forth in Exhibit C, or (C) a Recourse Note in the amount of one-twelfth of the Principal Sum in the form set forth in Exhibit B, or (D) a COMBINATION OF CASH, an Exhibit C Non-Recourse Note, and an Exhibit B Recourse Note, aggregating one-twelfth of the Principal Sum. PART II MINIMUM PRODUCT PURCHASE REQUIREMENT
In consideration of the TERRITORIAL DISTRIBUTORSHIP *546 transferred herein, TERRITORIAL DISTRIBUTOR agrees to purchase a MINIMUM OF PRODUCT from IMPORTER for cash. A. In 1979, TERRITORIAL DISTRIBUTOR must purchase for cash Product C or D (Colored Precious Gems) having an aggregate appraised Estimated Market Retail Price of not less than twenty-five (25%) percent of the Principal Sum Annual Installment, or, in the alternative: B. TERRITORIAL DISTRIBUTOR may purchase Product C or D (Colored Precious Gems) having an aggregate Estimated Market Retail Price of not less than $ 5,000 and Product A (Diamonds) for the difference between the minimum cash purchase provided for in Paragraph A and the cost of Product C or D multipled by 2.5. C. With reference to the Minimum Product Purchase Requirement only, the price for Product C or D (Colored Precious Gems), will be one hundred (100%) percent of its Estimated Market Retail Price. With reference to the Alternative Minimum Product Purchase Requirement including Product A (Diamonds) and Product C or D, the price for Product A will be fifty eight (58%) percent of its Estimated Market Retail Price.
Exhibit B was a form of recourse promissory note providing for payment of "the balance *547 of the principal indicated below in 5 equal annual installments plus accrued interest commencing on December 31, 2004." Exhibit C was a form of nonrecourse promissory note, also payable in 5 equal annual installments plus accrued interest commencing on December 31, 2004, secured by a Security Agreement. Exhibits B and C contained instructions to "(Zerox for use in years beginning 1980)." Exhibit D was a work sheet entitled "Independent Contractors Instructions and Work Sheet" containing the following instructions: 1. The basis of the Territorial Distributorship is an exclusive territory. The pricing is based upon the particular territory selected, the number of jewelry outlets inside the exclusive territory, additional jewelry outlets within the United States, and an area within or close by a foreign city. 2. Exclusive territories are selected only by UNITED STATES DISTRIBUTOR, INC. from its office in CARSON CITY, NEVADA. 3. When you offer the program, your prospect indicates PREFERENCES only, and he must understand that his preferences may no longer be available. 4. In each case, complete this work sheet before completing the TERRITORIAL DISTRIBUTORSHIP AGREEMENT. *548 5. In each case, fill in ten zip codes within the State of residence, five Cities outside the State of residence, and five foreign Cities, all in the Order of preference of your prospect. 6. When the Contract Documents and this Work Sheet are received by UNITED STATES DISTRIBUTOR, INC. the exclusive territory will be selected according to the preferences indicated, if possible. Otherwise the selection will be made according to availability.
Exhibit E was a form of resource promissory note to be used in 1979. Exhibit F was an acknowledgment to be signed by the territorial distributor as follows: The undersigned acknowledges that he has either read or has had available to him for reading all of the "TERRITORIAL DISTRIBUTORSHIP CONTRACT DOCUMENTS" which consist of a SUMMARY OF BUSINESS OPPORTUNITY, a TAX OPINION LETTER, and a TERRITORIAL DISTRIBUTORSHIP AGREEMENT. Signatures on this page relate to the entire TERRITORIAL DISTRIBUTORSHIP AGREEMENT, including the SECURITY AGREEMENT, and to EXHIBITS A, B, C, D, E, F, and G, and the signatures signify that the signer has read and understands the entire TERRITORIAL DISTRIBUTORSHIP AGREEMENT, including the EXHIBITS attached *549 thereto. In the event that Territorial Distributor makes no choice of total Territory, or that the Territory chosen is not available, DISTRIBUTOR is authorized to designate a Territory for him.
Exhibit G was a form of receipt for payment to independent contractor and instructions to Earl Martinson, Inc., Representative, as follows: You have two copies of the TERRITORIAL DISTRIBUTORSHIP CONTRACT DOCUMENTS with the same number. Exhibits D, E, F and G in each Manual must be filled out and fully executed. One of the Manuals is to be given to the TERRITORIAL DISTRIBUTOR, and the other is to be mailed to Professional Escrow Service, Inc. After acceptance by DISTRIBUTOR and IMPORTER, an executed copy of Exhibit F will be mailed to the TERRITORIAL DISTRIBUTOR for insertion in the copy of the Contract Documents retained by the TERRITORIAL DISTRIBUTOR. In the form of Exhibit D work sheet completed by him, petitioner listed the following preferences for territories: ZIP CODE PREFERENCE WITHIN
STATE OF RESIDENCE
1.
Northridge
6.
Flintridge
2.
Woodland Hills (Top. Plaza)
7.
Beverly Hills
3.
Palmdale
8.
Lancaster
4.
Brentwood
9.
San Diego
5.
Palm Springs
10.
San Francisco
*550 U.S. CITIES OUTSIDE
STATE OF RESIDENCE
FOREIGN CITIES
1.
Las Vegas, Nev.
1.
Queensland, Australia
2.
Salt Lake City, Utah
2.
Tahiti
3.
Miami, Florida
3.
Madrid, Spain
4.
Phoenix, Ariz.
4.
Cairo, Egypt
5.
Honolulu, Hawaii
5.
Tokyo, Japan
Neither the Territorial Distributorship Agreement signed by petitioner nor any document produced by respondent or during trial identified the territories in fact assigned to petitioner by U.S. Distributor, by zip code or otherwise. No sales were made by petitioner during 1979 or 1980 within the territories to which he expressed preferences on the work sheet to his Territorial Distributorship Agreement. Through the time of trial in March 1987, petitioner did not in any manner exploit his purported exclusive territories. The $ 60,000 distributorship fees deducted on petitioner's tax returns for 1979 and 1980 represented neither value received nor payments made by petitioner. The income reported by petitioner from his distributorship business on his 1979 and 1980 tax returns was earned from soliciting other territorial distributors and from incidental sales of gemstones. Petitioner's exclusive *551 territories were not connected to this income. The purported exclusive territorial distributorship was fictitious and sham. OPINION The only adjustments in dispute in this case are the deductions in each of two years of $ 60,000 purportedly represented by recourse promissory notes given as consideration for an "exclusive territorial distributorship." Petitioner contends that these "payments" are deductible under section 1253(d)(2)(B).[2] Respondent contends that the distributorship is a sham for Federal income tax purposes or, in the alternative, that petitioner is not eligible for the accrual method of accounting. We need not reach the alternative issue. This case is indistinguishable from Moore v. Commissioner,85 T.C. 72 (1985), in which we found that an exclusive territorial distributorship with the same structure purchased from the same promoters was a sham. *552 Petitioner argues that he is different from the taxpayer in Moore because he actually purchased and resold gemstones and that he intended to pay the promissory notes that he executed. We are totally unpersuaded by these claims. The key facts that were discussed by the Court in Moore in support of our conclusion there are also present here. There was more evidence in Moore as to the background of American Gold and U.S. Distributor than has been presented in this case. Petitioner, however, certainly presented no evidence that contradicted any of the findings in Moore as to the lack of substance to those entities. [3] Specifically, there is no evidence of the fair market value of the purported exclusive distributorship rights that petitioner was to receive under the agreement. Thus we have no reason to deviate from the description of the program as follows: Having paid nothing for the foregoing "right" to distribute American Gold's product worldwide, U.S. Distributor then proceeded to fragment this right into geographical segments and to "sell" such fragments as exclusive territorial distributorships to franchisees, each of whom would then theoretically undertake *553 to promote the sale of American Gold's product within the exclusive specified territory allocated to him. The minimum price for such a franchise or distributorship was $ 240,000, an amount that increased sharply depending primarily upon the amount of "tax savings" that the purchaser wished to achieve. Petitioner chose to purchase one for $ 384,000. The goal of the program was to sell some 5,000 distributorships, although only about 1,000 were actually sold. Even at the minimum price of $ 240,000, the total amount thus sold was at least about $ 240 million -- all for segments of a "right" which U.S. Distributor got for nothing and which was wholly illusory! * * * [85 T.C. at 102.] *554 We are unpersuaded by petitioner's assertions that he actually sold $ 139,000 worth of product between December 17 and December 31, 1979, and $ 1.5 million to the date of trial. Records supporting these claims were never produced.[4] The purported sales were not reported on petitioner's tax returns for 1979 or 1980. He explained at trial that the income reported as gross sales on his return was really the total sales less cost of goods sold and a "mistake" made because petitioner never took physical possession of the product sold. Petitioner admitted, however, that none of the sales in 1979 or in 1980 were within his purported exclusive territories. In any event, in Moore (85 T.C. at 103) we said: "The fact that petitioner did actually participate in some profit-oriented jewelry transactions wholly unrelated to his exclusive territory should not obscure the spurious nature of the franchise itself." *555 Petitioner claims that he had to become a territorial distributor in order to engage in his sales activities to others and that the agreement did not limit him to sales within the exclusive territories. If this were true, the consideration allegedly paid by him could not reasonably be allocated to the right to distribute within a specified area that is the premise of deductibility under section 1253. See section 1253(b)(1). The factors that we cited in Moore further confirming the sham character of the exclusive territorial franchise are equally present him. First, petitioner's purported exclusive territories were nowhere identified in the agreement or in any documents located to the time of trial. Although petitioner testified to certain territories by name, he was reciting, so far as we can tell, only the preferences that he expressed on the work sheet submitted by him. The documents expressly stated that those preferences were not binding on U.S. Distributor, and there was no confirmation from U.S. Distributor of specific assignments. Moreover, the assignments were to be made by zip code, whereas petitioner asserted that he had territories including Salt Lake City and *556 Miami, two cities that assuredly have more than one zip code assigned to them. Moreover, as in Moore, we are astounded by the claim that petitioner would obligate himself to pay hundreds of thousands of dollars to be assigned territories anywhere in the world with no indication of the economic feasibility of exploiting those territories from his residence in Southern California. Here, as we stated there: The location of the territory does not appear to have been of critical importance to petitioner, and the real explanation for this seemingly extraordinary situation is that this was no true, bona fide agreement to purchase an exclusive territorial franchise. [85 T.C. at 104.] In Moore, in assessing the bona fides of the entire transaction, we took account of the taxpayer's training and experience as a lawyer contrasted with the confusion, sloppy draftsmanship, and inaccuracies in documentation of the transaction. Although petitioner here may be held to a lesser standard, the contractual documents produced at trial, allegedly obtained by his counsel, Crooks, from U.S. Distributor, were in a state of disarray, unacceptable as evidence of any level of businesslike *557 conduct. The taxpayer in Moore, too, testified that he intended to pay the notes in question, but we did not find that testimony credible. The notes permitted the incredible option in the obligor of payments after the first year by recourse note, nonrecourse note, or a combination. Petitioner did not produce at trial in 1987 any notes or copies of notes executed after 1980. Although petitioner claims to have made sales totaling $ 1.9 million through the time of trial on purchases of $ 1.5 million, he presented no evidence of prepayments required on the notes. He testified that he paid "a little over $ 8,000" in prepayments. If, as he testified, he purchased products that cost $ 118,150 in 1979 and $ 1.5 million overall, prepayments of 10 percent of those amounts would have been due under paragraph 16 of the Territorial Distributorship Agreement. Petitioner asks us to accept his uncorroborated assertions of bona fide profit objective. Yet his assertions are simply too absurd to be accepted. He asserts that he agreed to pay a total of $ 1.2 million for an exclusive territory that was not specifically identified, not confirmed by any written document, not exploited by *558 him, and, so far as the evidence shows, not feasibly exploited or worth anything. He claims deductions of $ 60,000 in 1979 and $ 60,000 in 1980 based on "recourse" notes due in five installments commencing December 31, 2004. Documentary evidence at trial purportedly showing the extent of his business consisted of two letters to jewelry stores, one dated in 1980 and one in 1983; two handwritten advertisements; and checks and invoices reflecting purchases of gemstones in the amounts of $ 256.86, $ 1,000.37, and $ 1,476.63. He produced no documents substantiating his claims of purchase and sales transactions. After trial, petitioner attached to his brief various documents that were not produced for stipulation or offered in evidence at trial; they have not been authenticated in any manner. Some of them are dated in 1987, after the trial. Most of them are irrelevant. Even the untimely and fabricated documents do not purport to show any significant volume of actual sales within or without petitioner's exclusive territories. Examination of them, however, discloses the total lack of reliability of petitioner's representations. Attached to petitioner's brief as "Exhibit 9" is a *559 letter on the letterhead of Professional Escrow Service, Inc., dated July 28, 1980. That letter purported to enclose the missing exhibit D "which clearly reflects the jewelry outlets that comprise your Territorial Distributorship." The absence of such verification at trial has been emphasized in respondent's argument during trial and in respondent's opening brief. Attached to the letter dated July 28, 1980, as if it were enclosed therewith, was a document entitled "Amended Addendum to Exhibit D" dated September 5, 1983. We have no doubt that petitioner's exclusive territorial distributorship is a fiction, i.e., a sham transaction. He is not entitled to the deductions claimed for distributorship fees in either year in issue. It is therefore not necessary to determine whether, as an alternative, those deductions should be disallowed because of inappropriate use of the accrual method of accounting. We are also satisfied on the evidence that the addition to tax for negligence or for intentional disregard of rules and regulations was appropriately determined. Petitioner does not claim to have relied on any independent adviser. The Tax Opinion Letter that he purportedly relied *560 on specifically set forth factual conditions on which it was premised and recommended that the prospective distributor seek independent professional advice. Even without such advice, it must have been apparent to petitioner that he did not qualify as a bona fide territorial distributor and that the claimed tax benefits were too good to be true. As the Court of Appeals for the Ninth Circuit has stated in another tax-avoidance contest, "no reasonable person would have trusted this scheme to work." Hanson v. Commissioner,696 F.2d 1232, 1234 (9th Cir. 1983). Because the territorial distributorship was a sham transaction, petitioner is also liable for additional interest under section 6621(c)(3)(A)(v). See DeMartino v. Commissioner,88 T.C. 583 (1987). See also Patin v. Commissioner,88 T.C. 1086, 1127-1129 (1987). Finally, we are aware that petitioner may have another case pending for a later year. He and others similarly situated should consider carefully the applicability of section 6673, directing us to award damages not in excess *561 of $ 5,000 where a taxpayer's position is frivolous or groundless. Respondent has not asked for such an award here. Although we may impose such damages on our own volition, after due consideration, we refrain from doing so in this case. We will not hesitate to do so in the next one like it. See Oneal v. Commissioner,84 T.C. 1235 (1985); Hawkins v. Commissioner,T.C. Memo. 1987-233. Decision will be entered for the respondent.
Footnotes
1. Except as otherwise noted, all section references are to the Internal Revenue Code as amended and in effect during the years in issue. ↩
2. Sec. 1253 provides in part as follows: (a) General Rule. -- A transfer of a franchise, trademark, or trade name shall not be treated as a sale or exchange of a capital asset if the transferor retains any significant power, right, or continuing interest with respect to the subject matter of the franchise, trademark, or trade name. (b) Definitions. -- For purposes of this section -- (1) Franchise. -- The term "franchise" includes an agreement which gives one of the parties to the agreement the right to distribute, sell, or provide goods, services, or facilities, within a specified area. * * * (d) Treatment of Payments by Transferee. -- (1) Contingent Payents. -- Amounts paid or incurred during the taxable year on account of a transfer, sale, or other disposition of a franchise, trademark, or trade name which are contingent on the productivity, use, or disposition of the franchise, trademark, or trade name transferred shall be allowed as a deduction under section 162(a) (relating to trade or business expenses). (2) Other payments. -- If a transfer of a franchise, trademark, or trade name is not (by reason of the application of subsection (a)) treated as a sale or exchange of a capital asset, any payment not described in paragraph (1) which is made in discharge of a principal sum agreed upon in the transfer agreement shall be allowed as a deduction -- (A) in the case of a single payment made in discharge of such principal sum, ratably over the taxable years in the period beginning with the taxable year in which the payment is made and ending with the ninth succeeding taxable year or ending with the last taxable year beginning in the period of the transfer agreement, whichever period is shorter; (B) in the case of a payment which is one of a series of approximately equal payments made in discharge of such principal sum, which are payable over -- (i) the period of the transfer agreement, or (ii) a period of more than 10 taxable years, whether ending before or after the end of the period of the transfer agreement, in the taxable year in which the payment is made; and (C) in the case of any other payment, in the taxable year or years specified in regulations prescribed by the Secretary consistently with the preceding provisions of this paragraph. ↩
3. At the time of filing of this action, petitioner was represented by Philip R. Linsley, one of counsel to petitioners in Moore v. Commissioner,85 T.C. 72 (1985). Linsley withdrew on March 15, 1985. At the time of trial, John E. Crooks entered an appearance for petitioner. Crooks was withdrawn after being disbarred from practice before the Court as a result of his conviction for conspiracy to defraud the United States in relation to other tax shelters that he promoted with Joseph Laird. See United States v. Crooks,804 F.2d 1441 (9th Cir. 1986). Petitioner suggests that the Court was biased because of Moore and against Crooks. This assertion has no merit. See United States v. Conforte,624 F.2d 869, 881-882↩ (9th Cir. 1980). 4. At trial petitioner attempted to testify orally from summaries that he purportedly made from records. The records had not been stipulated or produced in accordance with the Standing Pre-Trial Order or otherwise made available. No foundation for the admissibility of the summaries was established. See United States v. Miller,771 F.2d 1219, 1238 (9th Cir. 1985); Davis & Cox. v. Summa Corp.,751 F.2d 1507, 1516 (9th Cir. 1985); Paddack v. Dave Christensen, Inc.,745 F.2d 1254, 1259-1261↩ (9th Cir. 1984).