CLEMENT FOERSTEL AND MARY FOERSTEL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Foerstel v. Commissioner
Docket No. 686-84.
United States Tax Court
T.C. Memo 1987-546; 1987 Tax Ct. Memo LEXIS 538; 54 T.C.M. (CCH) 982; T.C.M. (RIA) 87546; October 27, 1987. John E. Crooks, for the petitioners (at trial only). John O. Kent, for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined deficiencies in and additions to petitioners' Federal income taxes as follows: Additions to Tax
I.R.C.
Tax year Ended
Deficiency
Section 6653(a) [1]
12-31-78
$ 11,114.12
$ 555.71    12-31-79
13,029.79
651.49    12-31-80
22,727.58
1,136.38    12-31-81
24,435.75 * 1,221.79    In an amendment to his answer, respondent claims additional *539 interest under section 6621(c) on the ground that petitioners entered into a sham transaction identical to the sham transaction described in Moore v. Commissioner,85 T.C. 72 (1985). Petitioners have now conceded the deficiencies but dispute the additions to tax and additional interest. FINDINGS OF FACT Some of the facts have been stipulated,and the stipulated facts are incorporated in our findings by this reference. Petitioners were residents of Van Nuys, California, at the time their petition was filed. On or about December 28, 1978, petitioners paid $ 8,000 to Professional Escrow Service, Inc., in relation to a gem distributorship program referred to as "Orion USA." On their tax return for 1978, petitioners claimed a deduction of $ 32,000 as "Sec 1253 Trademark Transfer." Petitioners did not report any sales or other expenses relating to that activity for 1978. On or shortly after November 2, 1979, petitioners received a letter from Earl Martinson, Inc., containing the following statements: My company is the exclusive sales agent for a Territorial Distributorship Program involving Diamonds, Colored Precious Gems, Fine Gold Jewelry, and other products. *540 This program is similar to the Orion Program. However, it offers a much broader base of potential activity. Tax benefits may be greater and profits higher. Gem-Mart Consultants, Inc. is a corporation that functions to render merchandising assistance to Territorial Distibutors. It is also qualified to assist in your existing Orion Territorial Distributorship. Keep it in mind that your deduction was based upon a business expense; it is important that a legitimate business activity be maintained. Your giving instructions to Gem-Mart Consultants, Inc. and retaining the ultimate decision-making power will put you in business and keep you there. I am sending you a manual titled "Summary of a Tax-Sheltered Opportunity". Included in this summary is a specimen contract that may be entered into between Territorial Distributor and Gem-Mart Consultants, Inc. After reviewing the material, please feel free to call me. In order to further acquaint the Orion Licensees with the new concept of Territorial Distribution of Diamonds, Colored Precious Gems and Fine Gold Jewelry, we have scheduled two meetings, one for Saturday, November 10, 1979, and one for Saturday, November 17, 1979, at *541 10:00 A.M. at the 9th Floor, 15250 Ventura Blvd., Sherman Oaks, California. We urge all of you to attend for the benefits of your tax-sheltered business. You can learn ways and means of supporting the tax shelter end of your business and other valuable information. On or about December 10, 1979, petitioners purportedly became territorial distributors of United States Distributor, Inc., executing "Contract Documents" identical to those described in Moore v. Commissioner, supra, and in Bowman v. Commissioner, T.C. Memo. 1987-   , filed this date. The contract documents consisted of a 36-page (lettered and numbered) Tax Opinion Letter by Somers & Altenbach and a 13-page Terrritorial Distributorship Agreement with form exhibits A through G. The Tax Opinion Letter contained various warnings to the prospective distributor of potential attacks by the Internal Revenue Service on the deductibility of amounts relating to the distributorships. The opinion warned, among other things, of certain criteria adopted by the Internal Revenue Service for auditing perceived "abusive tax shelters." The opinion stated: E. In the present case, as in any leveraged *542 tax shelter, one or more of such criteria is likely to be present. If so, as in the case of any other leveraged tax shelter, acquisition of a Territorial Distributorship may be regarded by the Service as an "abusive" tax shelter and, therefore, the likelihood that the purchaser's tax return will be subject to audit may be increased. F. Therefore, multiple write-off programs are suspect, and those who buy them are well advised to determine the risks after independent advice from competent lawyers and accountants. * * * 4. Business Merits of the Transaction
The Territorial Distributor will have a right to sell the Product within a specific area. Whether the right is pursued with sufficient diligence is a matter of money, intention and attention to duty. This is true of any business proposition and those matters are beyond the ken of this writer. However, it is assumed herein that bad business ideas must fail and good business ideas may succeed, and whether the buyer of a Territorial Distributorship herein described makes money or loses money is up to him and the buying public.
The opinion analyzed in detail the purported tax benefits from the transaction on the *543 assumption that each territorial distributor adopted the accrual method of accounting for his distributorship. The Territorial Distributorship Agreement identified United States Distributor, Inc., as "distributor"; American Gold & Diamond Corporation as "importer"; and described various types of "product of importer." The agreement provided: 4. IMPORTER has delegated to DISTRIBUTOR the exclusive right to distribute worldwide one hundred (100%) percent of its PRODUCT as is described in Paragraph 3 hereof for a period of fifty years beginning with July 1, 1979. 5. DISTRIBUTOR will not compete with any TERRITORIAL DISTRIBUTOR and agrees that all of the PRODUCT to which it is entitled pursuant to Paragraph 4 will be made available exclusively to TERRITORIAL DISTRIBUTORS. 6. DISTRIBUTOR hereby transfers to TERRITORIAL DISTRIBUTOR and exclusive TERRITORIAL DISTRIBUTORSHIP permitting TERRITORIAL DISTRIBUTOR to engage in the business activity as set forth herein within the Specified Territory, including the right to distribute the PRODUCT to retail and wholesale outlets within the Specified Territory. 7. TERRITORIAL DISTRIBUTOR is entitled, along with all other TERRITORIAL DISTRIBUTORS *544 within the United States, to purchase the entire supply of the PRODUCT of IMPORTER on a pro rata basis with all other TERRITORIAL DISTRIBUTORS.
After various statements about the importer and its product, the agreement provided: B. DISTRIBUTOR warrants that: In the event TERRITORIAL DISTRIBUTOR adopts the accrual method of accounting for the business covered by this TERRITORIAL DISTRIBUTORSHIP AGREEMENT, DISTRIBUTOR will supply at its expense a defense of the tax treatment of TERRITORIAL DISTRIBUTOR projected in the Tax Opinion Letter. Such support will include representation of the Internal Revenue Service level upon the issuance of a 30-day letter from the Internal Revenue Service (IRS Form 950(DO) or its equivalent), and defense in the United States Tax Court and the United States Court of Appeals.
The agreement then set forth various percentages of stated Estimated Market Retail Price of each of the categories of product to be provided to the territorial distributors but did not contain any references to quantities of product to be sold at any price. The agreement further provided in pertinent part: 16. TERRITORIAL DISTRIBUTOR agrees to make prepayments to DISTRIBUTOR *545 on all Principal Sum Annual Installment Promissory Notes delivered from TERRITORIAL DISTRIBUTOR to DISTRIBUTOR pursuant to this TERRITORIAL DISTRIBUTORSHIP AGREEMENT. Said prepayments will be in the amount of ten (10%) percent of the total cost of TERRITORIAL DISTRIBUTOR for all PRODUCT purchased from IMPORTER pursuant to Paragraph 14. A TERRITORIAL DISTRIBUTOR will be instructed by DISTRIBUTOR as to the method of payment to be utilized with reference to this prepayment requirement. All prepayments received will be applied to Promissory Notes, whether Recourse or Non-Recourse in chronological order. This prepayment requirement will terminate on December 31, 2004. * * * 20. The term of the TERRITORIAL DISTRIBUTORSHIP will be 35 years commencing on the date of this agreement. 21. The TERRITORIAL DISTRIBUTORSHIP will include the Territory described in Exhibit D. 22. TERRITORIAL DISTRIBUTOR is authorized to appoint agents and dealers within the Territory. 23. In consideration of the Territorial Distributorship transferred herein, TERRITORIAL DISTRIBUTOR shall pay to DISTRIBUTOR a Principal Sum a set forth in Exhibit A, Part I, and purchase PRODUCT from IMPORTER as *546 set forth in Exhibit A, Part II.
Exhibit A to the Territorial Distributorship Agreement provided in part as follows: PART I PRINCIPAL SUM
In consideration of the TERRITORIAL DISTRIBUTORSHIP acquired herein, TERRITORIAL DISTRIBUTOR agrees to pay as a Principal Sum the amount set forth in Exhibit D. Said Principal Sum will be paid to DISTRIBUTOR in Annual Installments as follows: (1) One-Twelfth of the Principal Sum on the execution of this Agreement consisting of the Recourse Note set forth in Exhibit E. (2) On or before December 1, 1980, and continuing for an additional 10 years thereafter on December 1 each of said years, TERRITORIAL DISTRIBUTOR will deliver to DISTRIBUTOR: (A) cash in the amount of one-twelfth of the Principal Sum, or (B) a Non-Recourse Note in the amount of one-twelfth of the Principal Sum in the form set forth in Exhibit C, or (C) a Recourse Note in the amount of one-twelfth of the Principal Sum in the form set forth in Exhibit B, or (D) a COMBINATION OF CASH, an Exhibit C Non-Recourse Note, and an Exhibit B Recourse Note, aggregating one-twelfth of the Principal Sum. PART III MINIMUM PRODUCT PURCHASE REQUIREMENT
In consideration *547 of the TERRITORIAL DISTRIBUTORSHIP transferred herein, TERRITORIAL DISTRIBUTOR agrees to purchase a MINIMUM OF PRODUCT from IMPORTER for cash. A. In 1979, TERRITORIAL DISTRIBUTOR must purchase for cash Product C or D (Colored Precious Gems) having an aggregate appraised Estimated Market Retail Price of not less than twenty-five (25) percent of the Principal Sum Annual Installment, or, in the alternative: B. TERRITORIAL DISTRIBUTOR may purchase Product C or D (Colored Precious Gems) having an aggregate Estimated Market Retail Price of not less than $ 5,000 and Product A (Diamonds) for the difference between the minimum cash purchase provided for in Paragraph A and the cost of Product C or D multiplied by 2.5. C. With reference to the Minimum Product Purchase Requirement only, the price for Product C or D (Colored Precious Gems), will be one hundred (100%) percent of its Estimated Market Retail Price. With reference to the Alternative Minimum Product Purchase Requirement including Product A (Diamonds) and Product C or D, the price for Product A will be fifty eight (58%) percent of its Estimated Market Retail Price.
Exhibit B was a form of recourse promissory note *548 providing for payment of "the balance of the principal indicated below in 5 equal annual installments plus accrued interest commencing on December 31, 2004." Exhibit C was a form of nonrecourse promissory note, also payable in 5 equal annual installments plus accrued interest commencing on December 31, 2004, secured by a Security Agreement. Exhibits B and C contained instructions to "(Zerox for use in years beginning 1980)." Exhibit D was a work sheet entitled "Independent Contractors Instructions and Work Sheet" containing the following instructions: 1. The basis of the Territorial Distributorship is an exclusive territory. The pricing is based upon the particular territory selected, the number of jewelry outlets inside the exclusive territory, additional jewelry outlets within the United States, and an area within or close by a foreign city. 2. Exclusive territories are selected only by UNITED STATES DISTRIBUTOR, INC. from its office in CARSON CITY, NEVADA. 3. When you offer the program, your prospect indicates PREFERENCES only, and he must understand that his preferences may no longer be available. 4. In each case, complete this work sheet before completing the *549 TERRITORIAL DISTRIBUTORSHIP AGREEMENT. 5. In each case, fill in ten zip codes within the State of residence, five Cities outside the State of residence, and five foreign Cities, all in the order of preference of your prospect. 6. When the Contract Documents and this Work Sheet are received by UNITED STATES DISTRIBUTOR, INC. the exclusive territory will be selected according to the preferences indicated, if possible. Otherwise the selection will be made according to availability.
Exhibit E was a form of recourse promissory note to be used in 1979. Exhibit F was an acknowledgment to be signed by the territorial distributor as follows: The undersigned acknowledges that he has either read or has had available to him for reading all of the "TERRITORIAL DISTRIBUTORSHIP CONTRACT DOCUMENTS" which consist of a SUMMARY OF BUSINESS OPPORTUNITY, a TAX OPINION LETTER, and a TERRITORIAL DISTRIBUTORSHIP AGREEMENT. Signatures on this page relate to the entire TERRITORIAL DISTRIBUTORSHIP AGREEMENT, including the SECURITY AGREEMENT, and to EXHIBITS A, B, C, D, E, F, and G, and the signatures signify that the signer has read and understands the entire TERRITORIAL DISTRIBUTORSHIP AGREEMENT, *550 including the EXHIBITS attached thereto. In the event the Territorial Distributor makes no choice of total Territory, or that the Territory chosen is not available, DISTRIBUTOR is authorized to designate a Territory for him.
Exhibit G was a form of receipt for payment to independent contractor and instructions to Earl Martinson, Inc., Representative, as follows: You have two copies of the TERRITORIAL DISTRIBUTORSHIP CONTRACT DOCUMENTS with the same number. Exhibits D, E, F and G in each Manual must be filled out and fully executed. One of the Manuals is to be given to the TERRITORIAL DISTRIBUTOR, and the other is to be mailed to Professional Escrow Service, Inc. After acceptance by DISTRIBUTOR and IMPORTER, an executed copy of Exhibit F will be mailed to the TERRITORIAL DISTRIBUTOR for insertion in the copy of the Contract Documents retained by the TERRITORIAL DISTRIBUTOR. Robert F. Bowman, taxpayer in T.C. Memo. 1987-545 executed a receipt for payment to independent contractor in the form of Exhibit G, supra, and completed the "Exhibit D Work Sheet Independent Contractors Instructions and Work Sheet" used in this transaction. By those documents, petitioners *551 purportedly agreed to pay $ 480,000 over 12 years for a territorial distributorship. By letter dated March 18, 1980, Professional Escrow Service, Inc., transmitted to petitioners a copy of "Exhibit D, which reflects the territories that have been assigned to your jewelry outlets." Those territories were zip code 91411, Van Nuys, California; 63125, St. Louis, Missouri; Bracciano, Italy (population 7,681); and Terni, Italy (population 75,873). On their tax return for 1979, petitioners deducted $ 40,000 as "Sec 1253 Trademark Transfer Distributorship Fee." They reported no other income or expenses relating to the purported activity. On or about December 27, 1980, petitioners executed an additional set of "Contract Documents" identical to those described in Moore v. Commissioner, supra, and Bowman v. Commissioner, supra. On their tax return for 1980, petitioners claimed a deduction of $ 48,000 as "Distrib Fee." They did not report any other income or expenses relating to the activity. On their tax return for 1981, petitioners deducted $ 60,000 as a "Distribution Fee." They reported, in relation to sales of gems and jewelry, gross receipts of $ 52,793, *552 costs of goods sold of $ 62,571, commissions and postage of $ 2,646, and a net loss of $ 72,424. In the statutory notice of deficiency, respondent disallowed the trademark transfer or distribution fees claimed for each year. Respondent also increased income in 1978 by $ 600 and decreased income in 1979 by $ 996 in relation to an activity referred to as "Moniteau coal." OPINION On the basis of our decision in Moore v. Commissioner, supra, petitioners have conceded the deficiencies in this case. They contend, however, that they should be excused from the additions to tax for negligence under section 6653(a) because they relied on the tax opinion set forth in the "Contract Documents" that they signed. They have the burden of proof with respect to the additions to tax under section 6653(a) determined in the statutory notice. With respect to the additional interest asserted for the first time by amendment to the answer, respondent has the burden of proof. Rule 142(a), Tax Court Rules of Practice and Procedure.
The parties stipulated to various documents, including the "Contract Documents" executed in 1979 and 1980 that established that the purported distributorships *553 are identical to those found to be a sham in Moore v. Commissioner, supra, and in Bowman v. Commissioner, supra, tried and filed on the same dates as this case. As in Moore and Bowman, totally absent from the record is any evidence of sales made by petitioners within their purported territories. The evidence stipulated, therefore, establishes that the deductions claimed on petitioners' 1979, 1980, and 1981 tax returns for distributorship fees are attributable to one or more sham transactions for purposes of section 6621(c)(3)(A)(v). Thus the deficiencies attributable to disallowance of the distributorship fees in each year are subject to additional interest from December 31, 1984. See DeMartino v. Commissioner,88 T.C. 583, 589 (1987). See also Patin v. Commissioner,88 T.C. 1086, 1127-1129 (1987). The $ 32,000 deduction claimed for 1978 related to a gem distributorship known as Orion USA rather than United States Distributor, Inc. The evidence includes a letter from Earl Martinson, Inc., representing that United States Distributor, Inc., is "similar to the Orion Program." The reporting of the Orion USA *554 activity on petitioners' tax return for 1978 was the same as the reporting of petitioners' United States Distributor, Inc., activities in later years. Petitioners have conceded the deficiencies for all years, expressly because of our decision in Moore v. Commissioner, supra. We conclude, therefore, that Orion USA was also a sham and that the deficiency attributable thereto is also subject to interest under section 6621(c)(3)(A)(v). We have no information, however, about the activity known as "Moniteau coal." Respondent has not met his burden of proof to that extent. [2] The portion of the deficiency for 1978 attributable to that transaction does not bear interest under section 6621(c). With respect to the additions to tax under section 6653(a), petitioner Clement Foerstel testified at trial that he relied on the tax opinion that was part of the United States Distributor, Inc., contract documents. As we held in Bowman v. Commissioner, supra, such explanation is not adequate to avoid the additions to tax for negligence. *555 The language of the tax opinion warned prospective investors that they should seek independent counsel. They are not entitled to rely on professional advice unless the professional has been advised of the specific facts of their case. Both the tax opinion and the letter received by petitioners in this case from Earl Martinson, Inc., emphasized the importance of actually conducting a business in order to assure the deductions. For the first 3 years in issue here, petitioners reported no sales from the activity. The sales reported on their 1981 return have not been shown to be related to the purported exclusive territories. The substantial tax deductions that they claimed, at some multiple of their cash investment, were simply too good to be true. As the Court of Appeals for the Ninth Circuit has stated in another tax-avoidance context, "no reasonable person would have trusted this scheme to work." Hanson v. Commissioner,696 F.2d 1232, 1234 (9th Cir. 1983). The additions to tax for negligence are therefore sustained. To allow for computations necessitated by our conclusions as to the applicability of section 6621(c) in 1978, Decision will be entered under *556 Rule 155.
Footnotes
1. Except as otherwise noted, all section references are to the Internal Revenue Code as amended and in effect during the years in issue. * plus 50 percent of the interest due on an underpayment of $ 24,535.75.↩
2. We recognize that respondent believed that the case was totally settled and was surprised when trial was necessary. ↩