JOHN F. JACKSON, JR., and SHIRLEY JACKSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Jackson v. Commissioner
Docket No. 45345-85
United States Tax Court
T.C. Memo 1991-250; 1991 Tax Ct. Memo LEXIS 293; 61 T.C.M. (CCH) 2806; T.C.M. (RIA) 91250; June 5, 1991, Filed *293 Decision will be entered for the respondent. On December 21, 1982, petitioners paid $ 18,500 ($ 15,000 -- distributorship fee; $ 3,000 -- gemstones; $ 500 -- consulting fee) in connection with an arrangement assertedly to sell jewelry in certain geographic areas to which petitioners were to be assigned exclusive licenses. On their 1982 tax return, petitioners deducted $ 15,500 of these payments (the distributorship fee and the consulting fee). Held: (1) Petitioners are not entitled to their claimed deductions. (2) Petitioners' deficiency is attributable to a tax-motivated transaction ( sec. 6621(c)(3)(A)(v), I.R.C. 1954 and 1986). Richard R. Helmick, for the petitioners. Carol C. Mason, for the respondent. CHABOT, Judge. CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined a deficiency in individual income tax against petitioners for 1982 in the amount of $ 6,349, and determined that petitioners are liable for an increased rate of interest on the entire deficiency under section 6621. [1] The issues for decision are as follows: (1) Whether petitioners are entitled to deduct for 1982 $ 15,500 of the $ 18,500 they paid on December 21, 1982, in *294 connection with an arrangement assertedly to sell jewelry in certain geographic areas. (2) If petitioners are not so entitled, then whether petitioners are liable for increased *295 interest under section 6621(c). FINDINGS OF FACT Some of the facts have been stipulated; the stipulation and the stipulated exhibits are incorporated herein by this reference. When the petition was filed in the instant case, petitioners John F. Jackson, Jr. (hereinafter sometimes referred to as "John"), and Shirley Jackson (hereinafter sometimes referred to as "Shirley") husband and wife, resided in Littleton, Colorado. John entered the business of custom welding and repair shop machining work with his father in 1954. The business, a corporation, was named J & J Welding. When John's father died, John became the business' sole owner. By 1982, Shirley was doing the bookkeeping work for the business. John sold the machining part of the business and then, in 1984, sold the welding part of the business. In 1982, both John and Shirley were officers of J & J Welding; John spent at least 40 hours per week in this business, and Shirley worked an average of 3 full days per week in this business. That year, both John and Shirley turned 55 and began to look for ways to be gainfully employed in some other activity which would not involve so much strenuous manual labor and paperwork *296 as J & J Welding, and would be profitable. In 1982, John started a needlepoint-framing and picture-framing business, called Frame Junction. He took several picture-framing courses in a community college and other places to qualify himself for this, and he spent 1-2 hours per week on this business. On their 1982 tax return, petitioners reported no income and $ 924 of expenses from this activity. Respondent does not dispute these picture-framing deductions. In 1982, Lawrence D. Chapman (hereinafter sometimes referred to as "Chapman") presented petitioners with a proposal as to an arrangement for selling gems and jewelry in assigned territories. Petitioners had previously acted on some of Chapman's advice in connection with their purchase of certain mutual funds. On December 21, 1982, Chapman came to petitioner's place of business with a set of contract documents, which petitioners signed. As part of this transaction, Shirley prepared three checks as described in table 1. Table 1 Check No.
Payee Amount
2001
Professional Escrow Services, Inc.
$ 15,000
2002
Gem-Mart Joint Venture
3,000
2003
Gem-Mart Consultants, Inc.
500
Both petitioners signed all three checks. *297 Both petitioners also executed the following document: EXHIBIT E RECOURSE PROMISSORY NOTE (Thirty Years - 1982) For value received, the undersigned promises to pay to United States Distributor, Inc., the balance indicated below in five (5) equal annual installments commencing on December 31, 2007, without interest. Maker agrees to make prepayments on this note to the holder of this note. Said prepayments will be in the amount of five percent (5%) of the total cost to TERRITORIAL DISTRIBUTOR for all products purchased from American Gold & Diamond Corporation. Maker will be instructed as to the method of payment to be utilized with reference to this prepayment requirement. This prepayment requirement will terminate on December 31, 2007. Payments of principal will be made at the place designated in writing by the holder of this note. This is a Recourse Note. Maker's liability is not limited to any prepayment obligation, specific collateral or otherwise. Principal: $ 60,000 [handwritten] Dated as of: 12-21-82 [handwritten] This note is given in partial consideration for a Territorial Distributorship Agreement entered into between the maker and the payee hereof, and United *298 States Distributor, Inc., agrees that the maker may rescind this note and the entire Territorial Distributorship Agreement at any time prior to December 31, 1982, without cause, by notifying United States Distributor, Inc., in writing of said rescission. Upon said rescission, the maker hereof shall have no further liability to perform said Territorial Distributorship Agreement or to pay this note, and he shall receive any payments made pursuant to said Territorial Distributorship Agreement. UNITED STATES DISTRIBUTOR, INC. Signature Printed Name If a Corporation or other Business Entity: Street Address By City State Zip Code (Either one or more of the RECOURSE NOTES attached hereto as EXHIBITS E and/or the NON-RECOURSE NOTE attached hereto as EXHIBIT F must be executed in 1982 concurrently with EXHIBIT G.) Petitioners did not frequently execute $ 60,000 recourse promissory notes. Petitioners gave all three checks and the executed promissory note to Chapman at this December 21, 1982, meeting. As part of the events of this December 21, 1982, meeting, petitioners executed a Territorial Distributorship Agreement (hereinafter sometimes referred to as "the Agreement"), *299 which was accepted on February 10, 1983, by a person named Glen Symons (otherwise unidentified in this record, but see Moore v. Commissioner. 85 T.C. 72, 87 (1985)), as president of United States Distributor, Inc. (hereinafter sometimes referred to as "Distributor") and as "attorney-in-fact" of American Gold & Diamond Corporation (hereinafter sometimes referred to as "American Gold"). The Agreement describes American Gold as a manufacturer of gold jewelry and an acquirer of gems and jewelry; it states that Distributor has a 50-year (from July 1, 1979) exclusive right to distribute worldwide American Gold's products; and it transfers to petitioners the exclusive right to distribute American Gold's products in a "Specified Territory". On the work sheet submitted by petitioners to Chapman, petitioners listed the following preferences as to Specified Territory: CITY AND ZIP CODE PREFERENCE WITHIN STATE OF RESIDENCE
1. Littleton
2. Denver 3. Granby 4. Eagle 5. Grand Lake 6. Brush 7. Fort Collins 8. Wray 9. Grand Junction 10. Minturn U.S. CITIES OUTSIDE STATE OF RESIDENCE
1. West Springfield 2. Richland 3. Gower 4. Enid 5. *300 Woodland Hills FOREIGN CITIES
1. Jerusalem 2. London 3. Sidney, Australia 4. Auckland, New Zealand 5. Tokyo, Japan
In late February 1983, petitioners were assigned as their Specified Territory, the cities of Fort Collins, Colorado (petitioners' seventh choice among Colorado cities), West Springfield, Massachusetts (petitioners' first choice among United States cities outside Colorado was West Springfield, Missouri, where their daughter lived), and Ramat Gan, Israel (a city near Jerusalem, which latter city was petitioners' first choice among foreign cities). The Agreement describes the methods to be used in setting petitioners' costs for various categories of gems and jewelry. The Agreement provides as follows: 20. The TERRITORIAL DISTRIBUTORSHIP will include the Territory described in Exhibit D and Exhibit D-1. 21. TERRITORIAL DISTRIBUTOR [petitioner] is authorized to appoint agents and dealers within the Territory. 22. In consideration of the Territorial Distributorship transferred herein, TERRITORIAL DISTRIBUTOR shall pay to DISTRIBUTOR a Principal Sum as set forth in Exhibit A, Part I, and purchase PRODUCT from IMPORTER [American Gold] as set forth in *301 Exhibit A, Part II. 23. The TERRITORIAL DISTRIBUTORSHIP is subject to the following restrictions and limitations, reserving to DISTRIBUTOR and IMPORTER the following rights: (a) The right to disapprove any assignment of such interest, or any part thereof. (b) The right to require that TERRITORIAL DISTRIBUTOR sell or advise [sic] only PRODUCT of IMPORTER to the extent said right is not contrary to law. 24. TERRITORIAL DISTRIBUTOR specially represents and understands as follows: (a) That he has sufficient business experience to operate his Territorial Distributorship. (b) That he has the financial capacity to develop the Territory. (c) That he intends to personally promote the PRODUCT in the Territory acquired or cause. (d) That, as a TERRITORIAL DISTRIBUTOR, he will not be entitled to participate with other TERRITORIAL DISTRIBUTORS with reference to expenses profits, or otherwise. Further, that his profits, if any, earned as a TERRITORIAL DISTRIBUTOR will depend solely on his own management and marketing ability, and not that of the DISTRIBUTOR or the IMPORTER or any affiliate. (e) That he has read the Summary of Federal Taxation [2] and he understands that the tax incidents *302 involving his becoming a TERRITORIAL DISTRIBUTOR may vary from those of other individual TERRITORIAL DISTRIBUTORS, and there can be no assurance that the Internal Revenue Code or the Regulations thereunder, as they exist or as they may be amended, will allow any TERRITORIAL DISTRIBUTOR the tax benefits referred to therein. (f) That he believes there is a realistic possibility of profits from the operation of the TERRITORIAL DISTRIBUTORSHIP. (g) That, as a TERRITORIAL DISTRIBUTOR, he will not be entitled to utilize any trademark or trade name of DISTRIBUTOR or IMPORTER. (h) That the MINIMUM PRODUCT PURCHASE REQUIREMENT of Colored Investment Gems is not purchased as a part of the inventory of the TERRITORIAL DISTRIBUTOR for resale, and that the TERRITORIAL DISTRIBUTOR will continue to hold those Colored Investment Gems for purpose of display to prospective customers. The Agreement provides that "On or before December 31, 1982, and *303 continuing for an additional 11 years thereafter on before [sic] December 31 of each of said subsequent years," petitioners are to pay $ 60,000 to Distributor either in (1) cash, (2) a nonrecourse note, (3) a recourse note, or (4) a combination of the foregoing. Any such note would, like the recourse note set forth supra, require five equal annual payments beginning 25 years after the year of the note, not bear interest, and require prepayments in the amount of 5 percent of the cost of the gems and jewelry that petitioners buy from American Gold. Thus, under the Agreement, petitioners' payment obligations (except for the prepayment obligations based on petitioners' purchases from American Gold) could be satisfied as shown in table 2. Table 2 Payment Deadline
Amount
Petitioners' Age
Dec. 31
2007
$ 12,000
80
2008
24,000
81
2009
36,000
82
2010
48,000
83
2011
60,000
84
2012
60,000
85
2013
60,000
86
2014
60,000
87
2015
60,000
88
2016
60,000
89
2017
60,000
90
2018
60,000
91
2019
48,000
92
2020
36,000
93
2021
24,000
94
2022
12,000
95
$ 720,000
The foregoing complex of agreements, payments, promises, and ostensible obligations *304 are hereinafter referred to as "the American Gold arrangement". Norman Gardenswartz (hereinafter sometimes referred to as "Gardenswartz"), a Certified Public Accountant, had been petitioners' accountant for their personal and their business activities since about 1958. Gardenswartz first learned about the American Gold arrangement on January 26, 1983. Gardenswartz told John that "This was strictly a tax shelter type of thing because it was a four-for-one write off." He told John that he "would not prepare this tax return with this write off". Gardenswartz made a telephone call on petitioners' behalf in an unsuccessful try to rescind the deal and get petitioners' money back. Petitioners received a proposed Schedule C, prepared by Tax Reporters of America, in connection with the agreement. The proposed Schedule C shows no income, shows as expenses a "distributor fee" of $ 60,000 and a "consulting fee" of $ 500, and shows a net loss of $ 60,500. (Distributors had notified petitioners that it had a contract with Tax Reporters of America whereby the latter would prepare a Schedule C for petitioners for a fee of $ 50. Petitioners did not pay the fee; nevertheless, they received *305 the proposed Schedule C.) Petitioners gave the proposed Schedule C to Gardenswartz when they gave to him their other materials for preparing their 1982 tax return. Gardenswartz told petitioners that the proposed Schedule C deductions were not correct and that he would not put that deduction on petitioners' tax return. Gardenswartz obtained an extension of time to file petitioners' 1982 income tax return so that he and petitioners could confer with the Internal Revenue Service and determine how to handle the matter. Gardenswartz arranged for himself and John to meet with an IRS agent in Denver with whom Gardenswartz had just concluded a settlement on a tax shelter matter on behalf of a different client. On May 4, 1983, Gardenswartz and John met with the IRS agent in Denver for an hour or more to discuss the tax accounting for the transaction. Gardenswartz and John used this occasion to report to the IRS the apparent tax shelter use of this gemstone distributorship arrangement, as Gardenswartz understood professionals were being asked to do by the IRS to help identify possible abusive tax shelters. Petitioners filed their 1982 tax return on August 11, 1983. This tax return includes *306 a Schedule C on account of the American Gold management, which shows no income, shows as expenses a "distribution fee" of $ 15,000 and a "consulting fee" of $ 500, and shows a net loss of $ 15,500. The Schedule C also shows that "distributor" is the main activity of this business, that "jewelry" is the product, and that petitioners were operating this business at the end of 1982. Petitioners did not make any sales in their Specified Territory in 1982, 1983, or 1984. John did not spend any time developing petitioners' Specified Territory in 1982. John did not keep separate bank accounts or separate books and records for petitioners' asserted jewelry distribution business. On their 1982 tax return (after deducting their claimed $ 15,500 loss from the American Gold arrangement), petitioners show adjusted gross income of $ 51,910, taxable income of $ 36,331, and income tax liability of $ 7,456. Petitioners' itemized deductions include $ 1,918 of Colorado income taxes. OPINION Petitioners contend that they are entitled to their claimed deductions as "out of pocket cash losses suffered in a transaction entered into for profit." They contend that the claimed losses were suffered *307 in 1982 and deductible for that year "even though the existence and amount of the loss was not ascertained until a later year." In the alternative, they contend that they are entitled to all but $ 750 of their claimed losses (this apparently on the theory that the gems they bought were worth $ 3,750, rather than the $ 3,000 originally allocated to their purchase (see table 1, supra)). Respondent contends that (1) petitioners' gemstone distribution franchise is a "sham" for income tax purposes, (2) petitioners were not engaged in any trade or business of distributing gemstones in 1982, (3) petitioners did not suffer any loss in 1982, and (4) in the alternative $ 15,000 of petitioners' payments is properly allocable to the gems petitioners bought in 1982. Both sides briefly refer to the issue of increased interest under section 6621(c), but it is not clear whether they have a dispute directly about that provision, or only as a consequence of the resolution of the deductions issue. We agree with respondent's first contention as to the deductions issue; we agree with respondent's conclusion as to the section 6621(c) issue. Ordinarily, at this point we would identify, set forth *308 the text of, and analyze the relevant statutory materials (and discuss the case law and other materials bearing on the statutes) that control the allowability of the claimed deductions. We do not do so in the instant case because this Court has already disposed of the issues in Moore v. Commissioner, 85 T.C. 72 (1985), and Cherin v. Commissioner, 89 T.C. 986 (1987). The transactions of December 21, 1982, in the American Gold arrangement are essentially the same as those described in Moore, except that (1) in the instant case the promissory notes did not bear interest while those in Moore bore 6 percent simple interest (85 T.C. at 83), (2) in the instant case petitioners' total payment obligation was $ 720,000 (table 2, supra) while that in Moore was $ 384,000 (85 T.C. at 84), and (3) in the instant case petitioners deducted $ 15,500 while in Moore the taxpayer deducted $ 32,100 (85 T.C. at 97-98). In Moore, we held that the exclusive territorial franchise was a sham and disallowed the entire deductions for the distributorship fees and consulting fee. [3] The evidence in *309 the instant case does not contradict our findings or conclusions in Moore. Indeed, Gardenswartz's testimony makes it plain that he, too, doubted the substance of the scheme into which petitioners had entered. We conclude that the exclusive territorial franchise in the instant case is a sham, and petitioners are not entitled to deduct the claimed $ 15,500. [4]
*310 Petitioners contend that they would not have entered into the American Gold arrangement solely for the tax benefits, and thus petitioners "entered into the transaction with economic substance to them". (Emphasis in original.) Even if petitioners had some nontax motive for entering into the American Gold arrangement, that would not rescue their claimed deductions. As we explained in Cherin v. Commissioner, 89 T.C. at 993-994: We have never held that the mere presence of an individual's profit objective will require us to recognize for tax purposes a transaction which lacks economic substance. The economic substance of a business transaction and the intent, purpose, or motive of an individual investor, while sometimes equated, are not identical. A business transaction by its very nature must have economic substance, that is, a realistic potential for profit ( James v. Commissioner, 87 T.C. 905 at 924). The phrase "realistic potential for profit" does not mean that the transaction must make a profit or even that similar transactions generally are profitable. As we found in Abramson v. Commissioner, 86 T.C. 360 (1986), *311 only an average of 1 film in 10 is successful; in wildcat oil drilling, the success rate based upon the number of wells drilled may be low. Realistic potential for profit is found, however, when the transaction is carefully conceived and planned in accordance with standards applicable to the particular industry, so that judged by those standards the hypothetical reasonable businessman would make the investment. The intent or purpose, which motivates an individual to enter into a business transaction refers to the subjective state of mind of the particular taxpayer before the Court. Subjective intent cannot supply economic substance to a business transaction. Where, as in the case at bar, we examine the transaction and conclude as we do in this case that Southern Star's herd investment packages lack any realistic potential for profit, we need not examine the investor's state of mind. This analysis, where it can be used, avoids the difficult task of weighing dual motives, such as we were forced to undertake in Fox v. Commissioner, 82 T.C. 1001 (1984). Because the Southern Star transactions in this case lack economic substance, as did those in three other investor *312 cases we have decided, we hold, consistent with those opinions, that they are economic shams. [Fn. refs. omitted.] Moore and Cherin combine to foreclose deductions for 1982 on any theory that petitioners have presented. Finally, the foregoing, combined with our opinion in Cherin, 89 T.C. at 1000-1001, requires us to uphold respondent's determination that the deficiency in the instant case is "attributable to [a] tax-motivated transaction" within the meaning of clause (v) of section 6621(c)(3)(A). [5]
Petitioners complain *313 that "the broad-brush unthinking execution of all parties touched by a 'national tax shelter case', wittingly or unwittingly, carries the cure much too far and 'throws the baby out with the bathwater'." We appreciate petitioners' imagery, but imagery is not a sufficient predicate for allowance of the claimed deductions or avoidance of the increased interest under section 6621(c). After examining petitioners' other contentions, we conclude that these contentions have been dealt with in our opinions in Moore and Cherin and that nothing useful would be served by detailed analyses in the instant opinion. Decision will be entered for the respondent. Footnotes
1. The notice of deficiency refers to section 6621(d). This section was redesignated as section 6621(c) by section 1511(c)(1)(A) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2744. For simplicity, we will hereinafter refer to this section as section 6621(c). Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 as in effect for the year in issue; references to section 6621 are to that section of the Internal Revenue Codes of 1954 and 1986 as in effect for periods after December 31, 1984. Section 6621(c)↩ was repealed by section 7721(b) of the Omnibus Budget Reconciliation Act of 1989, Pub. L. 101-239, 103 Stat. 2106, 2399, effective for tax returns due after December 31, 1989 (sec. 7721(d) of the Act, 103 Stat. at 2400). Thus, the repeal does not affect the instant case.
2. The record does not include the referred-to "Summary of Federal Taxation".↩
3. In Moore v. Commissioner, 85 T.C. 72, 101↩ (1985), we noted that there were "random sales" of gems after the first year and that the taxpayer was "entitled to deduct any ordinary and necessary expenses associated with such random sales under section 212 of the Code". In the instant case, there is no evidence of sales, random or otherwise.
4. To the same effect are our Memorandum Opinions in Bowman v. Commissioner, T.C. Memo 1987-545, and Foerstel v. Commissioner, T.C. Memo 1987-546↩.
5. On brief, respondent refers to "§ 6621(c)(3)(A)(iv)". However, at trial, respondent's counsel made it plain that she was relying on clause (v) of section 6621(c)(3)(A), the "sham" category, and not on any other clause of section 6621(c)(3)(A)↩. It does not appear in petitioners' reply brief that they were misled by the reference to clause (iv). Accordingly, we take respondent's reference to clause (iv) as a harmless typographical error and not as a shift in position.