LAWRENCE R. & GWENDOLYN HAWKINS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hawkins v. Commissioner
Docket No. 31743-84.
United States Tax Court
T.C. Memo 1987-233; 1987 Tax Ct. Memo LEXIS 231; 53 T.C.M. (CCH) 780; T.C.M. (RIA) 87233; May 5, 1987. Arthur P. Tranakos, for the petitioner, at trial only. [1]
Christine Olson, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: Respondent determined deficiencies in and additions to petitioners' Federal income tax as follows: SECTION 6651(a)(1) [2]
SECTION 6653(a) [3]
SECTION 6659
YEAR
DEFICIENCY
ADDITION TO TAX
ADDITION TO TAX
ADDITION TO TAX
1977
$14,357 0
$783
0
1978
6,962
0
413
0
1979
2,818
0
437
0
1980
12,090
0
605
0
1981
21,796
$1,045 1,295
$6,345 1982
17,461
846
1,187
4,841
*233 After concessions, [4] the issues are whether petitioners are entitled to deductions and tax credits attributable to their investment in a master recording, whether petitioners are liable for the section 6653(a)(1) additions to tax, whether petitioners are liable for the section 6659 additions to tax, whether petitioners may deduct the cost of a foreign trust package, and whether damages should be awarded to the United States pursuant to section 6673. FINDINGS OF FACT Petitioners, husband and wife, resided in Walla Walla, Washington, at the time they filed their petition herein. Petitioner Lawrence R. Hawkins, *234 a successful medical doctor, earned during each of the years at issue between $98,000 and $119,000. Bob McKee created for Great Moments, Inc. ("Great Moments"), a corporation of which he was a partial owner, 39 master recordings. Each master recording contained previously recorded songs with narrative introductory remarks. Great Moments did not own the songs on the master recordings and sales of records or tapes derived from the master recordings to the general public would have subjected the seller thereof to both criminal and civil liability. The only possible commercial exploitation of the master recordings was by way of sales to radio stations. [5]
Great Moments sold the 39 master recordings to Four Way Productions, Inc. ("Four Way"), a corporation owned by Jerry Wilson. The sales contract was executed *235 on November 26, 1980, but indicates that the parties thereto had earlier consummated the sale. Great Moments warranted that it had full right to convey the content of the master recordings, "save and except for the recorded music portions." This qualified warranty reflects the limited commercial exploitation potential of the master recordings, i.e., sales of records and tapes derived from the master recordings could be made only to radio stations and not to the general public. The stated sales price of the 39 master recordings was $100,000 or $2,564 per master recording. There is no indication in the record that the cost to Great Moments for each master recording, including production costs, exceeded $2,564 per master recording. On May 14, 1980, Four Way sold 13 of the master recordings to The Snuggery, Inc. ("Snuggery"), a corporation owned by petitioners' trial counsel, Arthur P. Tranakos ("Tranakos"). On November 14, 1980, Snuggery sold one of the master recordings to Lex Terra Co. ("Lex Terra"), another corporation owned by Tranakos. Also on November 14, 1980, Lex Terra sold that master recording, the master recording which is at issue in this case, to petitioners. The *236 Four Way-Snuggery sales contract, the Snuggery-Lex Terra sales contract, and the Lex Terra-petitioners sales contract all fail to indicate the limited commercial exploitation potential of the master recording(s) sold. None of the above parties held, acquired, or transferred title to the songs on the master recording(s). In the Lex Terra-petitioners sales contract, Lex Terra warranted that the master recording contained "songs and performances by the performing artists," that Lex Terra had "good, marketable title" to the master recording, and that Lex Terra owned "all right, title, and interest in" the master recording. Lex Terra obviously breached the warranties that it had good marketable title to the master recording and that it owned all right, title and interest in the master recording. Tranakos prepared for Lex Terra a document entitled "Synopsis of Tax Shelter Program." The document lists the significant tax benefits a taxpayer in the 50% tax bracket would enjoy upon investing in a master recording but makes no reference to the profit potential of or risks involved with such an investment. The document focuses exclusively on tax benefits. Petitioner Lawrence R. Hawkins *237 received a copy of this document and was further told of the tax benefits by Tranakos and two others, Lylene Henderson and Lowell Anderson. The master recording purchased by petitioners contains the following songs performed by the indicated artists: Song
Performer
Side One
Walking the Floor Over You
Ernest Tubb
Why Me
Kris Kristofferson
Dumb Blonde
Dolly Parton
Walkin' After Midnight
Patsy Cline
Time
Pozo-Seco Singers
Shelter of Your Eyes
Don Williams
Side Two
Hey Porter
Johnny Cash
I Walk the Line
Johnny Cash
Ballad of a Teenage Queen
Johnny Cash
Guess Things Happen That Way
Johnny Cash
Ring of Fire
Johnny Cash
Folsom Prison Blues
Johnny Cash
Jackson
Johnny Cash & June Carter
A Boy Named Sue
Johnny Cash
One Piece at a Time
Johnny Cash
Of course, as stated earlier, these songs did not belong to Lex Terra, and the purported sale of the songs to petitioners did not vest title in petitioners. Each song on side one is preceded by a short narration which begins, "Hey, now, I'm Bob McKee and I'd like to welcome you to Great Moments in Country Music," and continues with an introduction *238 to the upcoming song. After each song on side one, there is additional narration which concludes, "Hey, now, I'm Bob McKee saying we'd love to have you join us again right here in this station when we bring you more Great Moments in Country Music." The format of the narration on side two is different from the format of the narration on side one, but not in any significant manner. Petitioners agreed to pay $225,000 for the master recording, to be paid as follows: $10,000 by cash; $15,000 by note due June 1, 1981; and $225,000 by note due June 1, 1990. Both notes are subject to the Lex Terra-petitioners sales contract, which indicates, inter alia, that the $225,000 note is to be retired by either the sales proceeds or net profits generated by exploitation of the master recording. A similar provision for retirement is not applicable with respect to the $15,000 note. Petitioners did not make the $10,000 cash payment on November 14, 1980, but rather, and in addition to the two notes discussed above, gave a note for $15,000 payable to Lex Terra due February 14, 1980. The $5,000 difference between the cash payment due on November 14, 1980, and the face amount of the note is apparently *239 attributable to "production expenses." The record does not reveal what "production expenses" entail. Petitioners paid the $15,000 note due February 14, 1981, on February 25, 1981, and the $15,000 note due June 1, 1981, on December 27, 1981. [6] Petitioners did not pay the interest as required by the notes. [7]
On November 14, 1980, petitioners entered into a distribution agreement with Airways Music Distributors, *240 Inc. ("Airways"), a corporation owned by Jerry Wilson, whereby Airways agreed to promote and distribute albums and tapes derived from petitioners' master recording. Petitioners were required to manufacture records and tapes to be available for distribution by Airways. Airways was to pay petitioners $2 for each record or tape ordered from petitioners for distribution and was further required to order $2,000 worth of records and tapes by February 14, 1981. Petitioners never manufactured any records or tapes, and Airways neither ordered $2,000 worth of records or tapes from petitioners nor paid $2,000 to petitioners. Prior to petitioners' purchase of the master recording, petitioners had no familiarity with the music industry. Petitioners did not call other record companies to compare their products, packages, and prices with those being offered by Lex Terra. Petitioners did not negotiate the sales price or terms of the sales contract. Petitioners did not even listen to the master recording prior to their purchase of it. At trial, petitioner Lawrence R. Hawkins attempted to justify this lackadaisical attitude of not listening to the master recording he was purchasing for $250,000 *241 by stating, "The way it was, is if this tape was not what I wanted, I could still choose another one." Prior to the purchase, petitioners did not have an independent appraisal of the master recording made to determine the master recording's fair market value. However, had petitioners investigated Lex Terra's chain of title or listened to the master recording, an independent appraisal would have been obviated, as petitioners would have been readily able to determine that the fair market value of the master recording was minimal. An investigation of the chain of title would have revealed a missing link, as the Great Moments-Four Way sales contract was not reduced to writing until November 26, 1980, 12 days after petitioners' purchase. The missing link would have cast a cloud on the title, thereby depressing the fair market value. Even if the Great Moments-Four Way sales contract was available for inspection, although the missing link would have been supplied, Lex Terra's ownership of the songs on the master recording would be seriously questioned as the Great Moments-Four Way sales contract reflects the limited commercial exploitation potential of the master recording. Of course, *242 had petitioners just listened to the master recording before its purchase, they would have recognized its limited commercial exploitation potential because the narration on the master recording refers to "this station" several times, clearly indicating that the master recording was made for use by radio stations. This limited commercial exploitation would also have depressed the fair market value. Petitioners and respondent both had expert appraisal reports made on the value of the master recording as of the time of petitioners' purchase. Respondent's expert report indicates the fair market value to be zero. Petitioners' expert report indicates the fair market value to be $300,000, based on predicted sales of 6,000 at $57 per record or tape. Even if we accepted the predicted sales figure or sales price, which we do not, [8] under the terms of the distribution agreement, petitioners would be entitled to only $12,000, that is, $2 for each record and tape. This amount would not be enough to recover petitioners' cash investment, much less pay the $225,000 note. The fair market value of the master recording at the time of petitioners' purchase was minimal. Its value to petitioners, *243 in light of the distribution agreement, was even less. Petitioners claimed losses and tax credits attributable to their investment in the master recording as indicated below: 1977
1978
1979
1980
1981
1982
Loss
0
0
0
$39,750
$52,851
$40,359
Tax Credit
* $14,357
* $7,018
* $1,018
$ 2,607
0
0
Respondent disallowed all of the above claimed losses and tax credits. On petitioners' 1981 return, they claimed a $4,897 deduction for legal fees. The portion of this deduction attributable to petitioners' purchase of a foreign trust package from Lex Terra, $3,000, was disallowed by respondent. Petitioners did not establish a trust, offered no evidence in support of the deduction, failed to establish that the $3,000 payment entitled them to receive any tax counsel, and did not argue the issue on brief. OPINION The first issue is whether petitioners *244 are entitled to deductions and tax credits attributable to their master sound recording activity. The burden of proof rests on petitioners. Rule 142(a). In Rose v. Commissioner, 88 T.C.     (February 5, 1987), we merged the tests applied in many prior opinions to fashion an objective test for determining whether deductions and credits attributable to generic tax shelters should be allowed. This test incorporates the objective factors found to be relevant in cases decided under section 183, as well as concepts underlying sections 38, 162, 167, and 212. Petitioners' master sound recording activity possesses each of the characteristics articulated by Rose to be indicative of a generic tax shelter: the promotional materials, the Synopsis of Tax Shelter Program, focused on tax benefits, in fact, focused exclusively on tax benefits; petitioners did not negotiate the terms of their purchase or the sales price; the right to commercially exploit the master sound recording is difficult to value in the abstract and the value placed on this right ($250,000) greatly exceeded the value placed on the storage receptacle of the master sound recording ($0); the cost of the storage *245 receptacle and the cost of the production of the master sound recording are relatively small ($2,564); and the bulk of the sales price of the master recording was represented by nonrecourse financing ($225,000 of $250,000). [9]Rose at     (slip opinion at 40-41). Accordingly, we conclude that petitioners' master recording activity falls within the Rose definition of generic tax shelter. We will apply the Rose test to determine whether petitioners' investment in the master recording is devoid of economic substance and should be disregarded for tax purposes. Under Rose, the following four factors are considered to determine if the activity under consideration is devoid of economic substance: (1) the primary purpose the taxpayer invested in the generic tax shelter, to be determined by examination of the dealings between the taxpayer and the promoter *246 of the generic tax shelter; (2) the relationship between the purchase price and the fair market value of the rights purchased; (3) the structure of the financing; and (4) the congressional intent to encourage the activity of the generic tax shelter. Rose at     (slip oppinion at 45-56). Primary Purpose of Investment
To determine the primary purpose of the investment in the generic tax shelter, we look to the dealings between the taxpayer and the promoter of the shelter. Petitioner Lawrence R. Hawkins was made aware of the tax benefits associated with his investment in the master recording by Tranakos and others. In addition, petitioners received a copy of the document styled "Synopsis of Tax Shelter Program" prepared by Tranakos. This document focused exclusively on tax benefits. Prior to petitioners' purchase of the master recording, they (1) had no familiarity with the music industry, (2) did not compare packages, products, and prices with those offered by Lex Terra, (3) did not listen to the master recording, (4) did not negotiate the price or terms of the contract, and (5) did not have an independent appraisal of the master recording made. The value of *247 the master recording was minimal, which petitioners were either aware of or could have determined by the slightest effort. Although petitioners entered into a distribution agreement, both they and the distributor ignored the provisions of the agreement: petitioners did not have any records manufactured and the distributor did not pay petitioners $2,000 for 1,000 records or tapes. Petitioners have acted in a totally unbusinesslike manner with respect to their investment in the master recording and have not shown sufficient proof of an actual and honest profit objective. Petitioners purchased the master recording primarily, if not exclusively, to obtain tax deductions and credits. Rose at     (slip opinion at 45). Relationship Between Sales Price and Fair Market Value
Petitioners agreed to pay $250,000 for a master recording which had only a minimal fair market value. Petitioners did not have an independent appraisal of the master recording made, but as was stated earlier, an independent appraisal was not necessary to reveal that the master recording was of minimal value. Merely listening to the master recording would have revealed its minimal value. The slightest *248 effort on petitioners' behalf would have indicated the tremendous discrepancy between the purchase price and fair market value of the master recording. Structure of the Financing
$225,000 of the $250,000 purchase price was financed by way of a nonrecourse note. Due to the low sales volume which was predicted by petitioners' expert as of the time of the purchase, 6,000, it was then and still is highly unlikely that any amount will ever be paid toward the $225,000 note. Congressional Intent to Encourage the Activity of the Generic Tax Shelter
Petitioners made no showing that Congress had any intent to encourage investment in master recordings such as the master recording in issue, and we have not been able to discover such a congressional intent. After evaluation of the four criteria set forth in Rose and discussed above, we hold that petitioners' master recording activity is devoid of economic substance and is to be disregarded for tax purposes. Accordingly, petitioners are not entitled to the claimed credits and deductions attributable to their investment in the master recording. [10]
*249 The next issue is whether respondent's determinations of section 6653(a)(1) additions to tax should be sustained. Section 6653(a)(1) provides for an addition to tax where any part of an underpayment is due to negligence. Petitioners bear the burden of proof. Bixby v. Commissioner,58 T.C. 757, 791 (1972). Petitioners claimed deductions and credits that were clearly not allowable. Since petitioners failed to show that their underpayments of tax were not due to negligence or intentional disregard of the revenue law, we sustain respondent's determinations of section 6653(a)(1) additions to tax. The next issue is whether the section 6659 additions to tax determined by respondent for the 1981 and 1982 taxable years should be sustained. This addition to tax will be imposed where there is a valuation overstatement and an underpayment in income tax of at least $1,000 attributable to the valuation overstatement. A valuation overstatement is a claim by a taxpayer on a return of the value of any property, or the adjusted basis of any property which is 150 percent or more of the correct amount of such valuation or adjusted basis, as the case may be. Sec. 6659(c). In *250 the returns in issue, petitioners claimed an adjusted basis of $250,000. However, since the transaction is devoid of economic substance and is to be disregarded for tax purposes, petitioners' correct adjusted basis is zero. Rose at     (slip opinion at 61). Accordingly, there is here present a valuation overstatement. Petitioners' claimed losses of $52,851 in 1981 and $40,359 in 1982, which were based primarily on petitioners' valuation overstatement, caused an underpayment of tax of at least $1,000. Accordingly, we hold that for 1981 and 1982 there was an underpayment in tax of at least $1,000 attributable to petitioners' valuation overstatement. Respondent's determination of additions to tax under section 6659 are sustained. The next issue is whether petitioners may deduct as a legal fee the $3,000 paid for a foreign trust package. In Luman v. Commissioner,79 T.C. 846, 858 (1982), we held that a taxpayer was not allowed to deduct as a legal fee an amount paid for a trust package where the taxpayer failed to show that the amount paid entitled her to tax counsel. Here petitioners have failed to show that the $3,000 paid to Lex Terra entitled them to *251 tax counsel. Accordingly, respondent's disallowance of the deduction is sustained. The final issue is whether the United States should be awarded damages pursuant to section 6673. We reach this issue on our own volition. In Grace v. Commissioner,T.C. Memo. 1986-304, also a master sound recording tax shelter case, we stated: Finally, we wish to caution petitioners and others who are involved in similar tax avoidance or evasion schemes that the Court is authorized to award damages to the United States in an amount up to $5,000 when a proceeding is instituted or maintained primarily for delay or where petitioners' position therein is frivolous or groundless. Sec. 6673. In Elliott v. Commissioner,84 T.C. 227, 248 (1985), affd. 782 F.2d 1027 (3d Cir. 1985), we warned that "[a]t some point arguments in these highly leveraged tax avoidance (or evasion) schemes must be regarded as 'frivolous or groundless,' [under] section 6673." We reiterate that language here and note that damages were considered in Brown v. Commissioner,85 T.C. 968 (1985), and awarded in Oneal v. Commissioner,84 T.C. 1235 (1985). *252 We will not hesitate to award damages in appropriate circumstances. We feel that the appropriate circumstances are here present and, accordingly, award the United States $5,000 in damages. Prior to trial, petitioners realized that they did not own the songs on the master recording and that Lex Terra had breached warranties made in the Lex Terra-petitioners sales contract. Rather than direct their litigational efforts toward Lex Terra, they maintained their position before this Court, and in doing so submitted an expert appraisal report which was simply incredible in that it predicted sales to the majority of the radio stations in the United States at $57 per record or tape. At trial, petitioner Lawrence R. Hawkins was asked whether he intended to pay the $225,000 note when it comes due in 1990. He answered, "sure." This willingness to pay back the note in light of Lex Terra's breached warranties, the terms of the sales contract and the note which effectively make the note nonrecourse, and the lackluster performance of the master recording can only be described as feigned. It is obvious to the Court that petitioner Lawrence R. Hawkins answered with such a cheerful "sure" solely *253 in an effort to mislead the Court. On the basis of the entire record, we readily hold that petitioners maintained this proceeding for the primary purpose of delay. To reflect the foregoing, An appropriate order will be entered and Decision will be entered for the respondent.
Footnotes
1. Arthur P. Tranakos has not participated in the briefing of this case as he has been suspended from practice before this Court for the two-year period commencing February 7, 1986.↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. ↩
3. mounts represent additions for section 6653(a) for 1977 through 1980, and additions for section 6653(a)(1) for 1981 and 1982. ↩
4. Respondent has conceded that petitioners are not liable for the section 6651(a)(1) additions to tax. Petitioners have conceded that charitable contribution adjustments determined by respondent are correct.↩
5. The parties have briefed this case on the assumption that exploitation of the master recordings to radio stations would not give rise to civil or criminal liability. We continue this assumption but note that we do not resolve the issue one way or the other. Our opinion is unaffected by whether or not radio exploitation would be free of criminal and civil liability.↩
6. Prior to the close of 1981, the year in which petitioners paid the two $15,000 notes, they claimed tax savings well in excess of the $30,000 amount paid: $25,000 in investment tax credits claimed on their 1977 through 1980 returns, all filed between November 14, 1980, and April 15, 1981, and $19,875 in tax savings attributable to a $39,750 loss claimed on their 1980 return (assuming, conservatively considering petitioners' income in 1980, a tax rate of 50%). Thus, all money used by petitioners to invest in the master recording was diverted from payments otherwise due the Federal government. ↩
7. Petitioners' 1982 return claims a $100 deduction for interest. The record, however, does not indicate to which note the interest is attributable or that such an amount was paid.↩
8. There were approximately only 9,000 radio stations in the United States in 1980. We recognize that exploitation of the master recording was not limited to the United States; however, we nonetheless find that predicted sales of 6,000 is simply absurd.↩
*. Tax credit carryback.↩
9. We have determined that the $225,000 note is nonrecourse because the note states that it is subject to the terms of the Lex Terra-petitioners sales contract and such contract states that the $225,000 note shall be retired by the sales proceeds or net profits generated by exploitation of the master recording.↩
10. Even if the $100 of interest claimed as a deduction on petitioners' 1982 return were with respect to a note other than the $225,000 nonrecourse note, cf. Rose v. Commissioner, 88 T.C.     (slip opinion at 56-58) (February 5, 1987), which is unlikely as only the $225,000 nonrecourse note remained unpaid in 1982, petitioners' interest deduction would nonetheless be denied because they have failed to prove that any amount was paid. Rule 142(a). See n.7, supra.↩