JOHN W. APPERSON AND VIRGINIA E. APPERSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Apperson v. Commissioner
Docket No. 26815-85.
United States Tax Court
T.C. Memo 1987-571; 1987 Tax Ct. Memo LEXIS 571; 54 T.C.M. (CCH) 1092; T.C.M. (RIA) 87571; November 16, 1987. John L. Sullivan, for the petitioners. Kathleen O. Lier, for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined deficiencies of $ 314 and *573 $ 7,644 in petitioners' Federal income taxes for 1981 and 1982, respectively, and additions to tax for 1982 of $ 382.20 under section 6653(a)(1),[1]50 percent of the interest due on $ 7,354 under section 6653(a)(1), and $ 2,206.20 under section 6659. Respondent further determined in the statutory notice that $ 7,354 of the deficiency for 1982, including $ 6,853 disallowed investment tax credit, was an underpayment attributable to a tax-motivated transaction under section 6621. The issue for decision is whether petitioners are entitled to investment tax credit and deductions relating to lease of a master recording. Preliminarly, however, we deal with petitioners' allegation that the Court abused its discretion in allowing respondent to amend his answer at the time of trial. Procedural Matters
The petition in this case was filed July 15, 1985, in response to a notice of deficiency sent April 15, 1985. The answer was filed September 19, 1985. By notice served July 8, 1986, the case was set for trial in Pasadena, California, on December 8, 1986. Thereafter, the Court was advised that the within case *574 was part of a group of cases known as American Educational Leasing and that counsel for petitioners in this case represented other taxpayers similarly situated. The case was continued to March 16, 1987, in order to allow the parties to discuss settlement and to secure stipulations by which other taxpayers similarly situated would be bound by the results of this case. On or about March 5, 1987, the parties executed a First Stipulation of Facts. That stipulation included the following paragraphs: 8. For the taxable year 1981, petitioners concede the deficiency in income tax determined by respondent in the amount of $ 314.00. However, petitioners assert that they are entitled to a refund in the amount of $ 3,361.00, based upon the carryback of an investment tax credit from 1982. Respondent asserts that petitioners are entitled neither to said carryback nor said refund. Respondent also asserts the applicability of the addition to tax under I.R.C. sec. 6659, and in the alternative, the addition to tax under I.R.C. sec. 6661. 9. For the taxable year 1982: a. Petitioners concede respondent's adjustment to Schedule C expenses, *575 for their magician activity, in the amount of $ 869.00. b. The remaining adjustments involve respondent's disallowance of expenses for an alleged Schedule C activity, involving the alleged sales of educational tapes, in the amount of $ 1,517.00 and the disallowance of investment tax credit claimed by petitioners for an audio master recording entitled "The Snow Queen" in the amount of $ 6,853.00. Neither party has conceded these adjustments. The petitioners claimed a tentative regular investment tax credit on their 1982 return in the amount of $ 18,627.00, of which amount $ 6,853.00 was used in 1982. c. Respondent has also asserted and petitioners denied the applicability of the additions to tax under I.R.C. sec. 6653(a)(1)(A), formerly I.R.C. sec. 6653(a)(1); I.R.C. sec. 6653(a)(1)(B), formerly I.R.C. sec. 6653(a)(2); and I.R.C. sec. 6659. In the alternative to I.R.C. sec. 6659, respondent asserts the applicability of the addition to tax under I.R.C. sec. 6661. Respondent has further asserted the applicability *576 of the increased interest provisions of I.R.C. sec. 6621(c), formerly I.R.C. sec. 6621(d).
The stipulation also set forth the various grounds on which respondent was asserting that the contested Schedule C expenses, investment tax credit, and investment tax carryover and carryback for 1981, 1982, and 1983 are not allowable. (The year 1983 was the subject of a separate petition in docket No. 1080-87. Although the parties had agreed that docket No. 1080-87 could be consolidated and tried with this case and included facts relating to 1983 in the stipulation, they failed to notify the Court of the pendency of the other case in time for such consolidation to be accomplished.) The case was called for trial on March 16, 1987. At that time respondent filed a motion to amend his answer and tendered an amendment to the answer consistent with the positions stated in the stipulation. The amendment to the answer alleged increased additions to tax and additional interest under section 6621(c) for 1981, and, in the alternative to the additions to tax under section 6659, additions to tax under section 6661 for 1981 and 1982. Respondent *577 also alleged additional grounds for disallowance of the investment tax credit and deductions. Petitioners objected to respondent's motion. Petitioners claimed that they were prepared only to try their case on the profit motive ground. The Court granted the motion and set the trial for March 24, 1987. At the commencement of trial, petitioners filed a motion to strike the amended answer. The motion was taken under advisement, pending petitioners' showing of prejudice from the amendment, and petitioners were specifically advised that the matter of prejudice could be argued in their briefs. At the conclusion of trial, the Court indicated that the case would be analyzed in accordance with Rose v. Commissioner,88 T.C. 386 (1987), and ordered simultaneous opening briefs due June 8, 1987, and reply briefs due July 23, 1987. The Court also explained the reasons for concluding that petitioners had not proven an actual and honest profit objective -- thus deciding against them the issue they said they were prepared to try. Petitioners' opening brief consisted of 11 pages, ignored Rose, and cited only two cases. It did not contain any showing of prejudice from the *578 amended answer. Petitioners failed to file a reply to respondent's 176-page opening brief. [2]
Respondent's claim in the amended answer for additions to tax and additional interest for 1981 was based on petitioners' claim for refund, which in turn depended on carryback of the unused investment tax credit relating to their 1982 master recording transaction. See Nielsen v. Commissioner,87 T.C. 779 (1986). Respondent, however, neither pleaded nor proved *579 a deficiency or underpayment for 1981.[3] Because the additions to tax under sections 6653(a), 6659, and 6661 and the additional interest under section 6621(c) are all dependent on a finding of an underpayment, respondent cannot be granted any relief on that aspect of his amendment to the answer. Because we sustain below the addition to tax under section 6659 for 1982, respondent's alternative claim for an addition to tax under section 6661 is moot. Petitioners are, therefore, not prejudiced by these additional claims for the first time in the answer. [4]
*580 To the extent that the amended answer asserts additional grounds for disallowance of the investment tax credit and deductions, we deal below only with the first two theories asserted by respondent, to wit: i. The alleged losses,investment tax credit and investment tax credit carryback are not allowable, because they are the result of bogus transactions contrived for the purpose of avoidance or evasion of tax. The alleged transactions were not bona fide arms length transactions at fair market value; said transactions lacked any economic substance other than the avoidance of tax. ii. In the alternative, the deductions, investment tax credit and investment tax credit carryback are not allowable because no bona fide trade or business or profit motive existed. As we stated in Rose v. Commissioner,88 T.C. 386, 408-415 (187), cases applying the "subjective" profit objective test of section 183 show common characteristics of those in which the "objective" test of economic substance has been applied. Thus we adopted a unified approach in which -- the objective and subjective tests merge into an approach in which the objective test incorporates factors considered *581 relevant in cases decided under section 183, as well as concepts underlying those statutes providing for the deductions (sections 162 and 167) and credits (sections 38 and 48) in dispute in this case. [88 T.C. at 414-415.]
The parties were advised at trial that this case would be analyzed under the unified approach. Petitioners have not shown, and apparently cannot show, any way in which the evidence would differ depending on whether we are determining profit objective under section 183 or using the unified approach of Rose v. Commissioner, supra. Thus they are not prejudiced by our consideration of the economic substance of the transaction. They are certainly not prejudiced by the allegations in the amendment to the answer relating to issues that we do not here decide. For the foregoing reasons, the motion to strike the first amendment to the answer will be denied. FINDINGS OF FACT Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. Petitioners were residents of Granite City, Illinois, at the time they filed their petition herein. During the years in issue, John W. Apperson *582 (Mr. Apperson) was employed as a police officer, and Virginia E. Apperson (Mrs. Apperson) was employed as a grocery store checker. Neither petitioner had any experience or expertise pertaining to production or marketing of records or any other phase of the recording industry. During 1982, on the recommendation of Donnell R. Mattingly (Mattingly), their tax return preparer, petitioners entered into a master recording transaction with American Educational Leasing (AEL). Mattingly was the president and a shareholder in S&M Investments, Inc., which was the regional sales director for AEL in the State of Missouri. Mattingly was not a certified public accountant and had no background, experience, or expertise in production or marketing of records or any other phase of the recording industry. Mattingly did not consult with any experts in the recording industry not associated with AEL before becoming a sales representative for AEL. S&M Investments, Inc., was entitled to receive commissions of 15 percent to 30 percent of gross funds remitted by it to AEL for master recording leases; the commission paid with respect to petitioners' lease was 30 percent. Prior to entering into the *583 transaction with AEL, petitioners received a brochure entitled "American Educational Leasing Investment Leasing Program." The brochure summarized the purported benefits of the program as follows: A VERY UNIQUE OPPORTUNITY with tax benefits to you * Limited liability (Total Cost Investment $ 11,000). * No overhead, no employees. * Passive Investment (no selling required). * High profit potential ($ 135,000+) to you. * Complete control (you contract with distributors of your choice). * Exclusive rights to property during lease term. * Limited liability leveraged lease (up to 400%). * Lease payment is 100% tax write off ($ 9,500). * Inventory cost to you $ 1,500 (one time cost). * Investment tax credit pass through from Lessor (AEL) to Lessee (you) of $ 18,500. Any difference in the above amount and 1982 taxes owed is available to taxpayer to secure a refund of taxes paid in 1979, 1980 and 1981 until excess is fully applied. If credit is not fully used up by this procedure, any remaining credit would be applicable to tax liability for 1983, 1984 and 1985. The 1981 Economic Recovery Act allows for excess ITC to be carried forward 15 years from enactment. *584 * * * 1. You the Lessee have the opportunity to lease an educational audio master tape from A.E.L. for a rental payment of $ 9,500. This payment is a one time prepaid rental for the entire term of a 7 year lease. There are no additional assessments or liabilities to you, the Lessee, for the seven year terms of the lease. 2. Since your the Lessee's motive for leasing an educational audio master tape is to derive a profit from the sales of your master tape, you must in addition to leasing the master tape from A.E.L.) cause your master to be distributed to nationwide retail, mail order, and premium outlets to obtain the maximum possible profit potential from the sales of your master tape. In order to do so you must contract with a record and tape distributor to distribute your master tape to the above mentioned outlets. A.E.L. cannot be and is not involved in record and tape distribution, however A.E.L. can recommend various record an tape distributors who will guarantee (for a fee) to manufacture and distribute your audio master for you. 3. Tax Consequences. (a) You the Lessee can utilize the tax advantages of this program by deducting the investment tax credit and prepaid *585 rental from your federal income taxes. (b) Under the A.E.L. limited liability lease programmthere are NO recourse notes for you to sign. When A.E.L. purchases a tape from International Horizon A.E.L. signs a full recourse note (made payable to International Horizons inc. for $ 185,000). A.E.L. is at full risk on signing the note and NOT YOU the Lessee. A.E.L. will however pass through our rightfully earned investment tax credit (to you the Lessee) totaling $ 18,500 for each master audio cassette leased. Combining all the deductions you the Lessee can obtain an equivalent tax write off of up to 4 to 1 for 1982. 4. Finally the only additional cost to you the Lessee is to pay A.E.L. 50% of revenues received by you from the distributor of royalties guaranteed through sales of your master cassette tape.
Although the brochure projected potential revenues from a 7-year lease of a master recording, primary emphasis was on tax benefits to be obtained. The sum of $ 135,000 "profit" referred to in the materials assumed sales of 450,000 recordings from 1982 through 1988. The forecast of sales and costs projected profit of $ 11,160, the amount necessary to recoup petitioners' cash *586 investment, only after sales of 40,000 units. The projections assumed a selling price per unit of $ 2.49 retail, $ 3.99 mail order, and $ 2.00 for premium sales. Petitioners also received a second brochure entitled "American Educational Leasing Presents: A Business Opportunity With a Unique Tax Investment/Tax Shelter" that represented the following: MULTIPLE WRITE-OFF EQUAL TO 4 : 1 NO monthly payments. NO financing involved. NO promissory notes to sign. POSITIVE cash flow potential. ONE-TIME INVESTMENT of $ 11,000 ($ 9,500 + $ 1,500 total investment in 1982. No further monies required). PROFIT POTENTIAL -- As much as $ 135,000 over the 7-year period of the investment. Cash distribution yearly, beginning in 1983. YOUR TAX SAVINGS IN 1982 WILL EXCEED $ 18,500! ! (Please note that if you cannot use the full $ 18,500 + income tax savings in 1982, you may carryback the excess to 3 prior years for a cash refund (with interest earned) from 1979, 1980, and 1981 in that order. The $ 18,500 is the INVESTMENT TAX CREDIT. The investment tax credit offsets your federal income tax liability, dollar for dollar. If, after zeroing out your *587 1982 federal income tax liability, you still have excess investment tax credits left over, you may go back and apply them dollar for dollar against 1983, etc. thru 1977 in that order until the FULL $ 18,500 IS CONSUMED.) Depending on your income tax bracket, this is your INCOME TAX SAVINGS (Not deductions, but actual tax savings) for this investment for 1982: 30% bracket
40% bracket
50% bracket
$ 18,907
$ 19,043
$ 19,179
(REMEMBER: Any unused tax savings must be carried back to amend your 1979, 1980, and 1981 income tax returns for cash refunds with interest earned. The Economic Recovery Act of 1981 allows I.T.C. to be carried forward 15 years from date of enactment.) THE FIRST $ 18,500 OF OUR INCOME TAX SAVINGS IS THE ITC (Investment Tax Credit) THAT IS BEING "PASSED THROUGH TO YOU THE LESSEE" BY THE LESSOR. THE SECOND PART OF YOUR INCOME TAX SAVINGS IS FROM THE AMORTIZATION (write-off) OF THE $ 9,500 PREPAID 7-YEAR LEASE EXPENSE AT $ 1,357 TAX DEDUCTION PER YEAR. THEN IF YOU TAKE THE $ 18,500 INVESTMENT TAX CREDIT AND ADD THAT TO THE TAX SAVINGS, THE DEDUCTION OF THE PREPAID LEASE ($ 1,357) GIVES YOU, YOU HAVE YOUR TOTAL INCOME TAX *588 SAVINGS FOR 1982. Please go back to page 1 for examples at the bottom of the page. WITH NO FURTHER INVESTMENT, YOUR INCOME TAX SAVINGS PER YEAR FOR THE NEXT 7 YEARS IS:
30% bracket
40% bracket
50% bracket
$ 407
$ 543
$ 679
This investment/shelter is available for: INDIVIDUALS, SOLE PROPRIETORS, PARTNERSHIPS, AND CORPORATIONS. THIS INVESTMENT/SHELTER IS REPORTED ON A SCHEDULE "C" FOR ALL NON-CORPORATE INDIVIDUALS. AEL was a division of H&L Schwartz. During 1982, Harold Schwartz (Schwartz) was the president of H&L Schwartz and of AEL. Illya Bond was the vice president of H&L Schwartz and AEL in 1982 and was president of those entities at the time of trial of this case. In 1982 Canary Kahn (Kahn) was the president of International Horizons Educational Audio Recordings, Inc., also known as International Horizons, Inc. (IHI). In approximately February 1982, IHI entered into an agreement with AEL, pursuant to which IHI would produce and sell "educational" master recordings to AEL. IHI began producing master recordings in about September 1982 and produced or began production on approximately 650 master recordings between September and December *589 1982. Under the agreement between IHI and AEL, AEL would pay IHI $ 1,000 in cash prior to producing each master recording. AEL would also deliver a form promissory note in the amount of $ 185,000. The sales price for "The Snow Queen" was identical to the sales price of each of the other master recordings purchased and leased by AEl in 1982. Although AEL's investment brochures represented that IHI had already sold its complete educational master recording series to AEL, actual production of each master recording did not begin until after a "Lease" for a particular master was executed. Upon the execution of a lease, Schwartz would request production of the master recording. Before entering into the AEL transaction, Mr. Apperson spoke to one of his co-workers. The co-worker, however, had neither expertise nor experience regarding any aspect of the recording industry. Neither petitioner consulted with anyone having any experience or expertise in any aspect of the recording industry or otherwise knowledgeable about leases or master recordings. On December 22, 1982, petitioners executed a document entitled "Lease" that stated, among other things, that petitioners were "leasing" *590 from AEL for a period of 7 years and 1 month the domestic rights to the audio master recording "The Snow Queen." Petitioners did not listen to the recording before executing the lease. They did not inquire about the length of the recording, the names of the narrators or actors, the number of versions of the story that were already in the market, or any other information that would cause any reasonable person to believe that 450,000 or 40,000 units of the master recording could be marketed. Prior to purchasing the master recording, they did not receive any appraisals of the master recording. Although they received appraisals from AEL after execution of the lease, they never received any independent information from which it could be concluded that the master recording had a value of $ 185,000. Although they were aware that "The Snow Queen" was a story by Hans Christian Andersen, they did not notice that the name of the author was misspelled in the lease and in the related documentation. Petitioners did not engage in any negotiation of the terms of the lease. Also on December 22, 1982, petitioners entered into a "Distribution Agreement" with Mark 56 Records and paid $ 1,500 in relation *591 to that distribution agreement. The distribution agreement provided in pertinent part as follows: 2 (a) Lessee hereby retains the services of the Distributor for the sum of $ 1,500.00 (one thousand five hundred dollars) to use each and every Master for the purpose of manufacturing and selling cassette tapes and phonograph records, both long playing and singles, together with cassettes and tapes, therefrom upon the terms and conditions of this Agreement throughout the Territory. Lessee will furnish Distributor with the Masters on execution of this Agreement or as soon thereafter as possible. * * * (g) Distributor hereby agrees to maintain a sufficient inventory of records derived from the Master to fulfill orders for the term of this Agreement. Distributor agrees that in any event it shall manufacture and have ready for distribution not less than 750 cassette tapes and/or phonographic records or any combination thereof. * * * 5 In respect to the Masters hereunder, and in full consideration for the rights herein granted, Lessee will pay to Distributor the following fees for the manufacture, distribution, promotion and sale of the Masters. (a) for singles long play recordings, *592 pre-recorded tapes and all other uses, a distribution fee of sixty percent (60%) of net receipts from the sale of such long play recordings, and Lessee shall receive forty percent (40%). (b) the term "net receipts" shall be deemed to mean all monies (gross receipts) received by distributor from the sale and exploitation of the master tape, less costs for promotion, advertising, shipping and cassette or phonograph record duplication. 6 Distributor shall collect all monies derived from this Agreement and shall remit to Lessee all of the net receipts so collected. (a) Amounts payable to Lessee shall be due and payable to Lessee and shall be computed for the preceding six (6) calendar month period within one hundred twenty (120) days after June 30th and December 31st of each year so long as tapes and records embodying performances embodied on the Masters are sold and paid for. Such amounts will be paid to Lessee within such one hundred twenty (120) day period and will be accompanied by appropriate statements setting forth all gross receipts and disbursements made therefrom in accordance with this Agreement for the prior six month period. All statements and all other accounts rendered *593 by Distributor to Lessee shall be binding upon Lessee and not subject to any objection by Lessee for any reason unless specified objection in writing stating the basis thereof is received by Distributor within two (2) years from the date rendered, in which event such statements shall be binding in all respects except for those specifically stated in such written objections. All statements, payments,,notices and correspondence to Lessee shall be sent to Lessee at the address indicated above unless prior written notice to the contrary is received from Lessee. Distributor shall be entitled to maintain reasonable reserves against returns to Distributor of records embodying performances embodied on the Masters distributed hereunder. However, all reserves must be liquidated at the end of the sell-off period as herein specified. During the last three weeks of 1982, IHI produced or began production on a significantly larger number of master recordings than had been requested between September and the first week of December 1982. Production of "The Snow Queen" did not begin until on or after December 24, 1982. IHI's total production cost for "The Snow Queen" was approximately $ 226.53, *594 and not more than $ 315. An assembly-line process was used by IHI in the production of each master recording. During the last three weeks of 1982, IHI ran three 8-hour shifts per day in an effort to produce all of the master recordings requested by AEL during that period. IHI had the capacity to produce a total of between 72 and 144 master recordings in one day. At some point during the last three weeks of 1982, Kahn logged the production of 100 master recordings in one day. Following the request by AEL for the production of a master recording, the first step in IHI's production assembly line was to obtain a script for the specific title. The scriptwriters were obtained by IHI primarily through newspaper advertisements. Each scriptwriter usually worked on an "as needed" basis from his or her residence, and many had other employment. The IHI scriptwriters were not specifically educated or experienced in writing scripts or in the specific topics of the scripts that they were writing. During the last three weeks of 1982, there were very demanding time constraints; the writers, therefore usually were given the script assignments via telephone. They wrote and delivered the scripts *595 to IHI within one day of receiving the assignment. Although AEL compiled the actual list of titles from which the master recordings were made, IHI and thus the scriptwriters had complete discretion regarding the contents of the tape recordings. The scriptwriters primarily used the public library as their source of information for the script. All of the nonoriginal titles produced by IHI, including "The Snow Queen," were public domain titles. IHI never requested permission nor gave credit in its productions to any individual whose translation or book was used in writing the script for a particular master recording. The scriptwriter for "The Snow Queen" was not a noteworthy writer; as of the date of the trial, IHI did not know the identity of the writer. The script, as a product of IHI's assembly line, was of very poor quality. The tape of "The Snow Queen," like the tapes of other titles produced by IHI for AEL, was poorly produced and amateurish. [5]
The actors for each recording produced by IHI were selected without regard to their suitability for the roles played. The actors would *596 usually rehearse the script once before recording. Actual recording of the master usually required approximately one or two hours. The two voices used in "The Snow Queen" recording were inappropriate. One actor had a British accent, while the story itself bore no particular relationship to anything British. The other actor, however, had no British accent. As a further part of the IHI assembly-line process, almost 100 percent of all of its productions, including "The Snow Queen," were less than 30 minutes in length, regardless of the time necessary properly to tell or discuss the subject story or topic. The IHI version of "The Snow Queen" was 28 minutes in length and almost two-thirds of the original Hans Christian Andersen fairy tale was omitted. Despite the heavily edited text, IHI included no notation that the production was an abridged version of "The Snow Queen," a fact which would have been significant to both distributors and the ultimate consumer of the product. The full recitation of "The Snow Queen" would have required 75 minutes. Despite IHI's heavy editing, the recorded story nevertheless was rushed to assure it would be 30 minutes or less in length. Petitioners *597 never saw or heard the actual master recording. They did not confirm whether 750 or any number of copies of the recording had been manufactured. Prior to the notice of deficiency in this case, they had received only three income statements from Mark 56 Records. Those statements covered the periods ending April 1, 1983, September 30, 1983, and January 31, 1984. Those statements reported no sales. Petitioners received from Mark 56 Records two checks dated April 15, 1985, and November 15, 1985, in the respective amounts of $ 1.42 and $ .28. Notwithstanding their failure to receive reports or income from Mark 56 Records, petitioners made no inquiries to AEL or Mark 56 Records until after their petition in this case was filed (and during a visit to their son in California). They made no attempt to find an alternative means of marketing the master recording. In 1982, spoken word recordings accounted for 10 percent of the sales in the entire audio cassette market. The market for spoken word audio cassettes was segmented into the institutional (public and private libraries and schools) and the trade (consumer) market. A highly quality spoken word production would have garnered sales *598 of between 50 and 500 copies per year in the institutional market. In the trade market, such a recording could have sold 3,000 in its best year. Thus, a high quality spoken word audio cassette, with an attractive price, and continuous promotion over a 3-year period could, at most, have achieved sales of between 5,000 and 10,000 units. All of the lessees of titles from AEL received identical appraisals of the titles leased. AEL paid $ 25 for each appraisal. Each appraisal assumed that the recording had a useful life of 14 years; that distribution of the master recording would have been effectuated via retail, mail order, and premium sales on a national level; that the contents of the master recording were of high quality; and that the recording would earn the average income of other educational recordings. None of these assumptions was based on any objective evidence with respect to tapes produced by IHI for AEL. The form promissory notes given from AEL to IHI in 1982 were in the amount of $ 185,000, with interest due thereon in the amount of 10 percent per annum. The notes further stated that AEL on order would pay to IHI 100 percent of its gross receipts attributable to the *599 particular master recording. At the end of the 14-year term of the note, the note provided that the remaining unpaid principal and interest became due and payable in full. The note, by its terms, was not transferable or assignable. It also purported to be secured by a security agreement allegedly executed concurrently with the note. Each promissory note was accompanied by a security agreement, which was also a form document. The security agreement stated that IHI had a security interest and general lien upon the specific master recording covered by the promissory note. The security agreement further stated that IHI had the right to transfer, assign, sell or otherwise dispose of the property upon 10 days prior written notice to AEL if AEL failed to pay its obligations when due under the promissory note. The security agreement stated that simultaneously with its execution, AEL was delivering executed financing statements, covering the particular master recording, for filing in the State of California. Neither Kahn nor IHI received any financing statements, and they did not file any financing statements in California. Prior to IHI's agreement with AEL, Kahn, Schwartz, and Bond *600 were involved with a master recording transaction at Entertainment Marketing Corporation (EMC), which was similar to AEL. Thus, IHI and AEL's relationship was based on this prior transaction. Kahn's corporation, Western Educational Services (WES), produced approximately 700 master recordings for EMC, and was scheduled to receive for each master a cash payment of $ 1,000 and a 12-year note in the amount of $ 180,000 or $ 185,000. In negotiating the amount of the AEL promissory note, the primary basis for the final $ 185,000 was Kahn's prior agreement with EMC to provide it with master recordings. WES did not receive payment or expect to receive payment on any of the promissory notes received from EMC. Mark 56 Records engaged in a minimal advertising campaign with respect to various AEL educational tape titles sold to investors, including a direct-mail distribution for Britannica Home Library Service, a division of Encyclopedia Britannica, in 1987. No significant level of actual sales resulted from such efforts. Such minimal sales efforts would not justify the assumption that more than a few hundred copies of any of the AEL cassettes would be sold. There was no reasonable or *601 realistic possibility that petitioners would receive proceeds of sales of copies of "The Snow Queen" sufficient to recover their cash payments to AEL. The note given by AEL to IHI was not likely to be paid and was given solely with the intent of creating an artificial basis in the master recording for purposes of the income tax laws. On their joint returns for 1982, petitioners claimed the master recording of "The Snow Queen" as qualified investment property in the amount of $ 186,272. They claimed a "tentative regular investment credit" in the amount of $ 18,627, of which $ 6,853 was used to offset their income taxes for 1982. They also claimed one-seventh of the $ 1,500 distribution fee, or $ 214, as advertising expense, and one-seventh of the $ 9,500 lease fee, or $ 1,357, as "depletion" expense. They claimed a refund of $ 8,955 taxes withheld by their employers in 1982. Immediately after filing their 1982 tax return, petitioners filed amended returns for 1979, 1980, and 1981, claiming refunds of $ 3,081 for 1979, $ 5,362 for 1980,and $ 3,361 for 1981. OPINION Petitioners contend that in 1982 they were seeking investments that would produce income for them. They assert *602 that they invested in "The Snow Queen" in reliance on Mattingly and on the materials received from AEL. It is apparent, however, that Mattingly and AEL were recommending the investment based on the anticipated tax benefits, which, in summary, would supposedly secure for petitioners over $ 18,500 in immediate tax refunds (including refund of their 1982 tax withheld) in exchange for payments totaling $ 11,000. Petitioners had no obligation beyond the initial payment in the absence of actual sales of the product, and they had no obligation to and in fact did not attempt to effect sales of the product. The purported fair market value of the tape assumed sales of at least 450,000 copies. Sales of at least 40,000 copies were necessary to recoup their cash investment, without regard to tax benefits. But petitioners never arranged for manufacture of more than 750 copies. The AEL program was psatently too good to be true. In their opening brief, petitioners cited only one case, Taube v. Commissioner,88 T.C. 464 (1987), with respect to the substantive issues here. We there held that the taxpayers had entered into a partnership that acquired an interest in two nursing *603 training films with the bona fide objective to make a profit. In that case, we analyzed the relevant factors under section 183 in determining profit objective at the partnership level and concluded that the taxpayers had satisfied their burden of proof. The partnership had conducted its activity in a businesslike manner, and the conclusion was supported by the fact that both films were well directed and of high quality. We also stated that our conclusion would be the same under the test of Rose v. Commissioner, supra.Taube v. Commissioner,88 T.C. at 481 n. 25. None of the facts found in Taube are comparable in any respect to the evidence and facts found in this case. To the contrary, petitioners' case is indistinguishable from the scores of cases in which we have concluded that the taxpayers did not engage in a master recording activity with an actual and honest profit objective. See, e.g., Estate of Baron v. Commissioner,83 T.C. 542 (1984), affd. 798 F.2d 65 (2d Cir. 1986); Flowers v. Commissioner,80 T.C. 914 (1983). because of the repetitious number of such cases with indistinguishable *604 facts, most of them are decided in Memorandum Opinions. In an early Memorandum Opinion, Snyder v. Commissioner,T.C. Memo. 1985-9, we referred to a master recording program as "specious stratagem of tax illusion." In a case involving a lease transaction comparable to that involved here, we stated: The facts speak for themselves. It would give undue dignity to petitioners' claims to belabor them or to repeat here what this Court and others have had to say about comparable situations in which we have repudiated "the right to engage in financial fantasies with the expectation that the Internal Revenue Service and the courts will play along." Saviano v. Commissioner,765 F.2d 643, 654 (7th Cir. 1985), affg. 80 T.C. 955 (1983). "The long and short of it all is that the parties demeaned themselves in entering so dishonest a venture, unquestionably structured to garner for each of the taxpayers tax advantages to which they were not entitled and devoid of any realistic business purpose. * * * [Barnard v. Commissioner,731 F.2d [230] at 232 (4th Cir. 1984), affg. Fox v. Commissioner,80 T.C. 972 (1983).] *605 " See also Elliott v. Commissioner, 84 T.C. [227] at 247-248 [(1985), affd. without published opinion at 782 F.2d 1027 (3d Cir. 1986)]. [Harmon v. Commissioner,T.C. Memo. 1986-305, 51 TCM 1491 at 1498-1499, 55 P-H Memo par 86,305 at 86-1315, 86-1322 - 86-1323.]
In other cases, the master recordings in issue featured well-known artists as contrasted to the unknowns involved in AEL's program. Even in such circumstances we have indicated that meritless proceedings, where there is a total lack of support for the excessive values claimed, as so groundless as to justify an award of damages under section 6673. Hawkins v. Commissioner,T.C. Memo. 1987-233; see McCain v. Commissioner,T.C. Memo. 1987-285; Secoy v. Commissioner,T.C. Memo. 1987-286; Grace v. Commissioner,T.C. Memo. 1986-304. [6]
*606 If the question of profit objective had been the only issue at the time of trial as petitioners contend, this case might have been the subject of an oral opinion under Rule 152, Tax Court Rules of Practice and Procedure. Because of the procedural questions raised by petitioners, the opportunity left to petitioners to move to reopen the record for further expert testimony, and the status of this case as one to which other parties represented by petitioners' counsel will be bound, deferred and more comprehensive factual findings and opinion are appropriate. Economic Substance
In Rose v. Commissioner,88 T.C. 386 (1987) we defined a generic tax shelter as having the following characteristics: (1) Tax benefits were the focus of promotional materials; (2) the investors accepted the terms of purchase without price negotiation; (3) the assets in question consist of packages of purported rights, difficult to value in the abstract and substantially overvalued in relation to tangible property included as part of the package; (4) the tangible assets were acquired or created *607 at a relatively small cost shortly prior to the transactions in question; (5) the bulk of the consideration was deferred by promissory notes, nonrecourse in form or in substance. * * * [88 T.C. at 412.]
All of those characteristics are present here. Under the analysis adopted in Rose, we conclude that the AEL lease program had no economic substance. The dealings between the lessees and AEL were based on promises of unrealistic tax benefits, lacked arm's-length price negotiation, and were not accompanied by any significant pre-transaction, investigation or post-transaction efforts to effectuate the distribution of the master recording. The claimed $ 186,000 sales price (between IHI and AEL) had no relation to the fair market value of the master, which was not more than $ 300. The master recording was produced after execution of the lease for a cost of approximately $ 300. Because of the purported pass-through of the investment tax credit to the lessee from AEL, the relevant structure of the financing is the $ 185,000 note given by AEL to IHI. Bond and Kahn testified that approximately $ 200,000 had been paid to IHI in 1982 in relation to 600 or 700 tapes. *608 Otherwise, no payments had been made on the notes. The lack of reality to the notes and the lack of relationship between the notes and the fair market value is demonstrated by the following testimony of Kahn: Q Okay. Now, you testified about the promissory notes in the amount of $ 185,000. Did you - what type of negotiations went on between yourself and Mr. Schwartz about setting that price? A A precedent had been set. In 1981, my having produced through Western Educational Services approximately seven hundred, six-eighty-five, or seven something, seven hundred units for them, at a price, an average price of one hundred and eighty, or eighty-five thousand dollars. Q Now, when you say average price, you mean you were given promissory notes: A Yes. So -- A Just the down payment. I was never paid the balance of the note and it's still accruing. They're also -- there were 12-year notes. Q Now, based on the promissory note that you had received, or that -- the promissory notes that you were getting in conjunction with EMC, how did that enter into your negotiations with Mr. Schwartz, in regard to American Educational Leasing and IHI? A Well, it was a very important part *609 of our initial negotiations because I already had a price established and I also had a routine established, having been the President of Western Educational Services; I had effectively run all of the routines that were necessary to begin production for his company. So, that's where the prices come from. Q Did the amount of the promissory note in 1983 go down? A Yes, it did. Q And what amount did -- were the promissory notes given to you in 1983? A I believe the gentleman mentioned -- I don't remember the exact -- it might have been one-sixty or -- Q Was it one-sixty-five? A I think it was that, yes. And it was -- Q And, how -- what was the reason for -- A Well, it was Mr. Schwartz' position that he was the best customer I had and that he should get a discount in quantity, and we argued over this early on in the negotiations of 1983, and finally, I really didn't have a choice because he was my biggest customer at the time, and I agreed.
The unavoidable conclusion from the evidence is that the notes bore no relationship to fair market value and would never be paid. There was absolutely no consideration of the merits or values of particular titles. Thus the "recourse" *610 label on the notes must be disregarded as mere form without substance. The final factor analyzed in Rose in determining whether a transaction has economic substance is perceived congressional intent is to impose the sanctions discussed below on taxpayers who engaged in transactions of the sort promoted by AEL. Because petitioners' lease transaction is totally lacking in economic substance, petitioners are not entitled to any deductions or investment tax credit. Additions to Tax and Additional Interest
Petitioners have failed to satisfy their burden of proving that the underpayment of tax in 1982 relating to the master recording activity is not due to negligence or intentional disregard of rules and regulations. They did not rely on anyone having expertise in the recording industry, and the promises of Mattingly, the sales agent for AEL, were simply too good to be believed. As the Court of Appeals for the Ninth Circuit stated in another tax shelter context, "no reasonable person would have trusted this scheme to work." Hanson v. Commissioner,696 F.2d 1232, 1234 (9th Cir. 1982). The addition to tax for negligence must be sustained. Petitioners claimed *611 on their returns a "passed through" adjusted basis of $ 186,272 and an investment tax credit of $ 18,627, $ 6,853 of which was used in 1982. With respect to a lease, section 48(d)(1) limits the amount eligible for the investment tax credit to the fair market vallue of the property acquired by the lessee. In this case, we have concluded that the property had a fair market value of not more than $ 300. We have also concluded that the transaction so lacked economic substance that the correct adjusted basis for purposes of the investment tax credit is zero. See Zirker v. Commissioner,87 T.C. 970, 978 (1986). Section 6659 provides in pertinent part: (a) Addition to the Tax. -- If -- (1) an individual, or (2) a closely held corporation or a personal service corporation, has an underpayment of the tax imposed by chapter 21 for the taxable year which is attributable to a valuation overstatement, then there shall be added to the tax an amount equal to the applicable percentage of the underpayment so attributable. (b) Applicable Percentage Defined. -- For purposes of *612 subsection (a), the applicable percentage shall be determined under the following table: If the valuation claimed is
the following percent of the The applicable
correct valuation --
percentage is:
150 percent or more but
not more than 200 percent
10
More than 200 percent but
not more than 250 percent
20
More than 250 percent
30
(c) Valuation Overstatement Defined. -- (1) In general. -- For purposes of this section, there is a valuation overstatement if the value of any property, or the adjusted basis of any property, claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be). (2) Property must have been acquired within last 5 years. -- This section shall not apply to any property which, as of the close of the taxable year for which there is a valuation overstatement, has been held by the taxpayer for more than 5 years.
In the statutory notice, respondent applied the 30 percent addition to tax to the total amount attributable to the master recording activity. The disallowed investment tax credit is correctly *613 subjected to section 6659(a). The deductions other than the investment tax credit, however, are not attributable to a valuation overstatement. See Zirker v. Commissioner,87 T.C. at 980-981. The correct amount of the addition to tax under section 6659, therefore, is 30 percent of $ 6,853, or $ 2,055.90. Finally, in the statutory notice, respondent determined that additional interest under section 6621(d), now section 6621(c), would apply to the sum of $ 7,354, including $ 6,853 disallowed investment tax credit. The disallowed investment tax credit was attributable to a valuation overstatement and thus accrues additional interest under section 6621(c)(3)(A)(i). The balance of the underpayment attributable to petitioners' master recording activity results from disallowance of the deductions for amortization of the lease payment and the distribution fee and advertising expenses paid. The underpayment attributable to these deductions is subject to additional interest under section 6621(c) for either of two reasons. First, because we have found that petitioners did not have an actual and honest profit objective, the deductions are not allowed pursuant to section *614 183. Temporary Regulations adopted on December 26, 1984, pursuant to section 6621(d)(3)(B) [now section 6621(c)(3)(B)] applicable to interest accruing after December 31, 1984, state that "any deduction disallowed for any period under section 183" is subject to additional interest. Sec. 301.6621-2T, A-4(1), Proced. & Admin. Regs. (Temporary), 49 Fed. Reg. 59394 (Dec. 28, 1984). See Rose v. Commissioner, supra at 427. Second, section 1535 of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2750, amended section 6621(d) [redesignated as section 6621(c) by the Act] to include in the list of tax-motivated transactions "(v) any sham or fraudulent transaction." This language surely describes the transaction entered into by petitioners with AEL. See Patin v. Commissioner,88 T.C. 1086, 1128-1129 (1987). Decision will be entered in accordance with this opinion.
Footnotes
1. Except as otherwise noted, all section references are to the Internal Revenue Code as amended and in effect during the years in issue. ↩
2. Petitioners did not have present at trial any witnesses to fair market value of the master recording in question and claimed that certain witnesses were evading service of subpoenas. Petitioners were allowed 30 days to move to reopen the record for such expert testimony. They failed to do so. In view of petitioners' post-trial omissions, we might conclude that they have abandoned the case and dismiss it. See Stringer v. Commissioner,84 T.C. 693 (1985), affd. without published opinion 789 F.2d 917 (4th Cir. 1986), and Calcutt v. Commissioner,84 T.C. 716↩ (1985). Because other petitioners are bound by the result in this case, we have filed this opinion. 3. Respondent states in his brief that the refund claimed by petitioners for 1981 was not paid to them under respondent's refund freeze program. See Rev. Proc. 84-84, 1984-2 C.B. 782; Rev. Rul. 84-175, 1984-2 C.B. 296. Respondent asserts that the unrefunded amount constitutes a rebate for the purpose of computing an underpayment of tax. Compare Persh v. Commissioner,78 T.C. 100 (1982), in which refunds based on carrybacks had actually been paid. There is no evidence of the status of petitioners' refund in the record, however. See Rule 143(b), Tax Court Rules of Practice and Procedure.↩
4. By press release issued February 17, 1987, the Chief Judge set forth conditions under which motions to amend an answer to assert additions to tax under sec. 6661↩ normally would be granted at trial. Those conditions, i.e., timely and adequate notice, were satisfied here. 5. This finding is based inpart on the Court's inspection of and hearing of the tape. ↩
6. Hawkins v. Commissioner,T.C. Memo. 1987-233, the first such case in which damages were actually awarded, was filed after this case was tried. We reached the issue of damages under sec. 6673 on our own volition where it was obvious that the taxpayer had testified in an effort to mislead the Court. McCain v. Commissioner,T.C. Memo. 1987-285, and Secoy v. Commissioner,T.C. Memo. 1987-286, were also filed after trial of this case. Respondent has not moved for an award of damages here, and the circumstances are distinguishable from those in Hawkins.We see no reason not to award such damages, however, in any future case comparable to this one. Petitioners' apparent post-trial abandonment of this case (failing to file an adequate opening brief or to file any reply brief) may well be an acknowledgement of the futility of their claims. Their conduct may also support a conclusion that this proceeding was maintained primarily for delay. ↩